We therefore deny the petition for rehearing but remand.

John HOWARD, Petitioner–Appellant,

v.

Hans G. WALKER, Respondent–Appellee.

Docket No. 01–2471.

United States Court of Appeals, Second Circuit.

Argued: March 5, 2003.

Remanded: March 18, 2003.

Re-argued: March 2, 2005.

Decided: April 26, 2005.

Randa D. Maher (Jeffrey G. Pittell, on the brief), Great Neck, N.Y., for Petitioner–Appellant.

Loretta S. Courtney, Assistant District Attorney, Rochester, N.Y., for Respondent–Appellee.

Before: JACOBS and POOLER, Circuit Judges, and HALL, District Judge.*

* The Honorable Janet C. Hall, of the United States District Court for the District of Connecticut, sitting by designation.

JANET C. HALL, District Judge.

Petitioner, John Howard, appeals from a judgment of the United States District Court for the Western District of New York (Feldman, M.J.) denying his application for a writ of habeas corpus under 28 U.S.C. § 2254. Howard was convicted of various charges, including Murder in the Second Degree and Burglary in the First Degree, on August 26, 1994 in the County Court of the State of New York, Monroe County. Howard claims that the trial court erred by allowing the State's expert witness to base her testimony on statements otherwise inadmissible pursuant to *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968); limiting Howard's ability to cross-examine the state's expert; and denying Howard the right to present a defense. Because we find that the trial court's limitations on cross-examination of the State's expert witness and its denial of Howard's ability to call an expert witness were contrary to clearly established federal law and were not harmless, this Court reverses the district court's ruling and vacates Howard's convictions for Murder in the Second Degree and Burglary in the First Degree. In light of these findings, we decline to reach the remaining issue raised by Howard, the admission of the State's expert's testimony based on *Bruton*-infected statements.

## I. FACTS

Howard is currently incarcerated in New York State pursuant to a judgment of conviction on Burglary in the First Degree, Petit Larceny, Criminal Mischief in the Fourth Degree, and Murder in the Second Degree, entered on August 26, 1994. The 1994 trial followed the reversal of his first conviction of these same charges. Howard has been incarcerated in connection with these offenses since 1991.

The charges at issue in this petition arose out of the burglary of the home of Joanna Metz in the early morning hours of April 13, 1990. Later that day, Ms. Metz was found dead in a chair located in an upstairs bedroom in her home. The prosecution claimed at trial that, as a result of the stress caused by the burglary, Ms. Metz, an 89–year old woman with a history of heart problems, suffered a heart attack and died.

Howard, along with his two co-conspirators, Eric Williams and Daniel Williams, was arrested in connection with the incident. Upon their arrests, each provided a statement to the police admitting his involvement in the burglary. Each statement verified that all three men participated in the burglary of Ms. Metz' home, but relayed different details regarding what occurred. In his statement, Howard admitted taking part in the Metz burglary, but he claimed he did not go upstairs and denied he had any contact with Ms. Metz. He further claimed that he left the house after hearing Ms. Metz yelling and that Eric and Daniel Williams left the house later, some time after Howard had already started walking away.

Eric Williams' statement, which was not allowed in evidence, provided a more detailed, and significantly different, account of the events. In his statement, Eric Williams claimed that he and Howard went upstairs and encountered Ms. Metz. Eric Williams said that Ms. Metz slapped Howard three times, after which encounter Howard grabbed Ms. Metz and put her in a chair. Eric Williams claimed Ms. Metz, crying, asked for her medicine but that Howard yelled at her and would not let her get it. Shortly thereafter, Eric Williams claimed Ms. Metz' body started jumping and then was still. By this time, according to Eric Williams' statement, Howard had gone back downstairs. Eric

Williams followed Howard downstairs and told Howard and Daniel Williams about Ms. Metz' seizure.

Daniel Williams' written statement, which was likewise not admitted into evidence, indicated that Howard and Eric Williams had gone upstairs while he had remained downstairs. He also stated that Eric Williams stayed upstairs for a few minutes after Howard came back downstairs. In his statement, Daniel Williams recounted hearing Ms. Metz say something while the three men were in her house and claimed that both Howard and Eric Williams told him that Ms. Metz had slapped Howard while the two were upstairs.

Prior to Howard's first trial, Daniel Williams pled guilty and agreed to testify against Howard and Eric Williams. At the 1994 trial, however, Daniel Williams testified that he could not remember what had occurred during the evening in question, that his prior statements about that evening had been based on Eric Williams' statement, and that he would lie if he thought it would help him. Daniel Williams, at times, stated that he could not remember whether Howard went into Ms. Metz' residence, whether Howard went upstairs, or even if there was a second level in the house.

The State introduced no evidence tending to show Howard's presence on the second floor of Ms. Metz' house. His own statement did not indicate that, and neither did the state's physical evidence. The State recovered sneaker prints from the residence, but the prosecution's forensic chemist could not reach a conclusion regarding which shoes had left the prints. Howard's sneaker prints were only found in the kitchen.

The State also offered the testimony of Dr. Jacqueline Martin, a county medical examiner, in support of its case. Dr. Mar-

tin testified that Ms. Metz had died of a heart attack, which was induced by the stress of the burglary. Prior to her testimony, defense counsel conducted a voir dire examination of Dr. Martin in which she revealed that she based her opinion in relevant part on information obtained from the statements of the defendant and his two co-conspirators. The defendant objected to Dr. Martin's testimony on the ground that it was based in part on unreliable, inadmissible statements otherwise precluded pursuant to *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). The trial court denied Howard's motion to exclude Dr. Martin's testimony.

In connection with its ruling to allow the admission of Dr. Martin's testimony, the court also established parameters for the defendant's cross-examination of Dr. Martin. It ruled that, if Howard attacked the basis for Dr. Martin's expert opinion through cross-examination, the State would be permitted to present to the jury all of the evidence Dr. Martin considered, including the statement by Eric Williams.

Defense counsel then inquired of the court whether two specific potential questions would "open the door" to the court's admission of Eric Williams' statement. Howard's attorney indicated his desire to ask: (1) Can you say to a reasonable degree of medical certainty that, if Ms. Metz had taken a Nitrostat pill, she would not have had a heart attack?; and (2) Can you say to a reasonable degree of medical certainty that if Ms. Metz' house had not been burglarized or broken into on April 13th, that she wouldn't have had the heart attack that evening?

The defense designed the first question to address the State's claim in its opening statement that Ms. Metz had medication in her purse, but that the purse was removed

from her possession during the burglary. The trial court noted that, if the defense were to mention the medication, the State would be entitled to establish that Ms. Metz may have experienced additional stress because the medication, according to Eric Williams' statement, had been deliberately withheld.

With regard to the second question, the defense expressed its interest in establishing that there was a possibility Ms. Metz would have died that day, even in the absence of a burglary. The trial court again held that, if the defense were to so inquire, the State would be entitled to present the otherwise-inadmissible evidence relied upon by Dr. Martin, including Eric Williams' statement. The court explained that the defense's proposed question would "change dramatically the view of what occurred that morning in the eyes of the jury" and that since Dr. Martin had considered information that demonstrated that this was "much, much much more" than just an ordinary burglary, the state would be entitled to introduce such information as evidence. Trial Tr. at 543. The court also ruled that the defense would not be permitted to ask general questions intended to establish that sometimes individuals have heart attacks even in the absence of a precipitating event. Again, the court found that this line of questioning would entitle the state to present the full version of what occurred on the night in question, as relied upon by its expert, Dr. Martin.

The defense also indicated its intent to call its own expert, Dr. Richard E. Abbott, who would testify that he could not conclude to any degree of certainty that Ms. Metz' heart attack was induced by stress or any particular event.[1] Indeed, he would testify that no medical examiner could say with certainty whether the burglary of Ms. Metz' home caused her to suffer a cardiac arrythmia. The trial court ruled that, if the defense called Dr. Abbott, the State would be able to cross-examine Dr. Abbott using Eric Williams' statement and the particular information contained within it.

On direct examination, Dr. Martin testified that the burglary of the home was "an important factor on Mrs. Metz' death." Trial Tr. at 574. More specifically, Dr. Martin testified that she believed that "the break-in and ransacking on both floors" would have "caused fear in Joanna Metz in her condition," and that that fear played a role in her death. Trial Tr. at 575. Dr. Martin also testified that, based on the information in the police records, she concluded the stress Ms. Metz experienced was "severe." Trial Tr. at 577.

The defense's cross-examination of Dr. Martin, limited as it was by the trial court's rulings, was extremely brief. Howard's attorney merely established that there were not any external signs that Ms. Metz suffered from a heart condition or that Ms. Metz suffered physical trauma prior to her death, and then he ended his cross-examination.

The jury found Howard guilty of Burglary in the First Degree, Petit Larceny, Criminal Mischief in the Fourth Degree, and Murder in the Second Degree. On his conviction for Murder in the Second Degree, Howard was sentenced to an indeterminate term of 22 years to life to run concurrently with his sentences on the other three convictions, including a sentence of 10 to 20 years on his conviction for Burglary in the First Degree. Howard appealed his conviction to the Supreme

---

1. While Dr. Abbott was given the *Bruton*-infected statements to review, he did not rely on those statements in rendering his opinion. His review of the statements did not alter or affect his opinion.

Court of New York, Appellate Division, raising, *inter alia*, the challenges outlined below. That court denied his claims. *People v. Howard*, 241 A.D.2d 920, 661 N.Y.S.2d 386 (4th Dept. 1997). The Appellate Division concluded that Dr. Martin "testified that her opinion regarding the cause of death would be the same even without the information obtained from the statement of one of the accomplices." *Id.* at 388. Furthermore, the court found that, should any error have occurred, such error was "harmless in light of the other evidence that established that the victim was alive at the time of the burglary." *Id.* The Appellate Division did not consider the harmlessness of any other error purported by Howard to have occurred. With respect to any other issues presented for review before that court, the Appellate Division simply stated that the court had "considered the other contentions raised by defendant ... and conclude that they are without merit." *Id.* Howard sought leave to appeal to the New York Court of Appeals, which court denied him such leave on September 24, 1997. *People v. Howard*, 90 N.Y.2d 940, 664 N.Y.S.2d 759, 687 N.E.2d 656 (1997). Having exhausted his state claims, Howard timely filed a petition for habeas relief in the United States District Court for the Western District of New York.

The case was referred upon consent of the parties to Magistrate Judge Feldman. *See* 28 U.S.C. § 636(c)(1). The district court denied Howard's petition for habeas corpus relief. *Howard v. Walker*, No. 98–CV–6427Fe (W.D.N.Y. June 26, 2001). The district court granted a certificate of appealability limited to Howard's allegations that Dr. Martin's reliance on *Bruton*-infected statements to form an opinion regarding the time and cause of Ms. Metz' death violated his rights under the Sixth Amendment. *Id.* slip op. at 26. Howard appealed to this court. Following oral ar-

gument, the panel remanded the case to the district court for supplementation of the record pursuant to *United States v. Jacobson*, 15 F.3d 19, 21–22 (2d Cir.1994). The panel required that the district court make findings of fact and conclusions of law on the issue of whether Howard had been deprived "of the opportunity to present a meaningful defense, in violation of his right to due process under the Fourteenth Amendment and his right of compulsory process under the Sixth Amendment, by ruling that the substance of Eric Williams' statement—otherwise inadmissible under *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968)—could be disclosed if petitioner's counsel cross-examined the prosecution's expert witness on the basis of her opinion or called his own expert witness." *Howard v. Walker*, 57 Fed. Appx. 502, 503 (2d Cir.2003).

On remand, the court below issued an amended decision and order without holding a hearing. The district court found that Howard's meaningful defense argument depended on the extent to which the government's expert, Dr. Martin, had relied on the co-defendant's statement. The court found that Dr. Martin based her opinion on "ample other evidence not tainted by *Bruton*." *Howard v. Walker*, No. 98–cv–6427Fe, 2004 WL 1638197, at *5 (W.D.N.Y. July 21, 2004). Magistrate Judge Feldman cited to the Fourth Department's determination that Dr. Martin's testimony "would be the same even without information obtained from the statement of one of the accomplices." *Id.* at *6 (quoting *People v. Howard*, 241 A.D.2d 920, 661 N.Y.S.2d 386, 388 (4th Dep't 1997), *leave to appeal denied*, 90 N.Y.2d 940, 664 N.Y.S.2d 759, 687 N.E.2d 656 (1997)). The district court also rejected Howard's contention that the trial court's limitations on his ability to cross-examine

Dr. Martin or to call his own expert witness violated his constitutional rights under the Compulsory Process Clause of the Sixth Amendment or the Due Process Clause of the Fourteenth Amendment.

The appeal having been reinstated to this court's docket pursuant to our March 18, 2003 mandate and having heard argument on March 2, 2005, in an order dated March 7, 2005, this court reversed the district court's denial of a writ of habeas corpus and vacated Howard's state conviction for Murder in the Second Degree by Order on March 7, 2005, and indicated that this opinion would follow. The evidentiary rulings challenged by Howard implicate both his conviction for Murder in the Second Degree and Burglary in the First Degree. Howard is guilty of Burglary in the First Degree if "he or another participant in the crime ... [c]auses physical injury to any person who is not a participant in the crime." [2] N.Y. Penal Law § 140.30. The evidentiary rulings discussed below do not, however, implicate Howard's conviction for Petit Larceny, Criminal Mischief in the Fourth Degree, or the lesser included offense of Burglary in the Second Degree as none of those charges requires a jury to find the element of physical injury to a person.

## II. DISCUSSION

■ This court's review of a denial of a petition for habeas corpus is *de novo*. *See, e.g., Zappulla v. New York*, 391 F.3d 462, 466 (2d Cir.2004). The district court's factual findings are reviewed for clear error. *See, e.g., Cox v. Donnelly*, 387 F.3d 193, 196 (2d Cir.2004).

## A. Federal Habeas Review of State Convictions

■ A federal court "shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). A claim that a state conviction was obtained in violation of state law is not cognizable in the federal court. *See Estelle v. McGuire*, 502 U.S. 62, 68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991); *Dunnigan v. Keane*, 137 F.3d 117, 125 (2d Cir.1998).

■ The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104–132, 110 Stat. 1214 (1996), substantially amended the statutory law governing federal review of habeas corpus petitions. *See* 28 U.S.C. §§ 2244, 2253, 2254, and 2255 (2000). The amendments "place[ ] a new constraint" on the ability of a federal court to grant habeas corpus relief to a state prisoner "with respect to claims adjudicated on the merits in state court." *Williams v. Taylor*, 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). A federal court cannot grant a petition for a writ of habeas corpus filed by a person in state custody with regard to any claim that was rejected on the merits by the state court unless the adjudication of the claim in state court either:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) re-

2. In New York, a person is guilty of Burglary in the First Degree only if, in the course of the burglary, he is armed with a deadly weapon, causes physical injury to any person who is not a participant in the crime, uses or threatens use of a dangerous instrument, or dis-

plays a loaded firearm. N.Y. Penal Law § 140.30. At no time did the State accuse Howard of use of a weapon, dangerous instrument, or firearm in connection with the burglary of Ms. Metz' home or provide any evidence to that effect.

sulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). To determine whether this standard of review applies, this court must first determine whether the state court adjudicated an issue on the merits. "A state court adjudicates a petitioner's federal claims on the merits when it (1) disposes of the claim on the merits, and (2) reduces its disposition to judgment." *Norde v. Keane*, 294 F.3d 401, 410 (2d Cir.2002)(internal quotation marks omitted). A claim need not be addressed in detail by a state court to have been "adjudicated on the merits." *See, e.g., Ryan v. Miller*, 303 F.3d 231, 245–46 (2d Cir.2002) (finding that a "blanket statement" that "[t]he defendant's remaining contentions are either unpreserved for appellate review or without merit" constituted adjudication on the merits). In the instant case, all of the issues before this court were adjudicated on the merits by the state court. *People v. Howard*, 241 A.D.2d 920, 661 N.Y.S.2d 386, 388 (4th Dep't 1997) ("We have considered the other contentions raised by defendant, including those raised in his *pro se* supplemental brief, and conclude that they are without merit."), *leave to appeal denied*, 90 N.Y.2d 940, 664 N.Y.S.2d 759, 687 N.E.2d 656 (1997).

█ Clearly established federal law "refers to the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state-court decision." *Kennaugh v. Miller*, 289 F.3d 36, 42 (2d Cir.2002) (internal quotation marks and alterations omitted). "A federal court may not grant habeas simply because, in its independent judgment, the 'relevant state-court decision applied clearly established federal law erroneously or incorrectly.'" *Fuller v. Gorczyk*, 273 F.3d 212, 219

(2d Cir.2001) (quoting *Williams*, 529 U.S. at 411, 120 S.Ct. 1495). Rather, a decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decided a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 413, 120 S.Ct. 1495.

█ A state court decision is an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* As this court has instructed the district courts, "[i]n determining whether an application was objectively unreasonable, a habeas court does not require that 'reasonable jurists would all agree' that the state court erred; on the other hand, 'the most important point is that an unreasonable application of federal law is different from an incorrect application.'" *Jones v. Stinson*, 229 F.3d 112, 119 (2d Cir.2000) (quoting *Williams*, 529 U.S. at 411, 120 S.Ct. 1495). Although "'some increment of incorrectness beyond error is required . . . the increment need not be great.'" *Id.* (quoting *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir.2000) (internal alteration omitted)).

If this court finds that the state court engaged in an unreasonable application of established law, resulting in constitutional error, it must next consider whether such error was harmless. *See Brecht v. Abrahamson*, 507 U.S. 619, 629–30, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). Again, this court is required to consider the state court's resolution of this question. In the instant case, the state court determined that admission of Dr. Martin's testimony was not in error and, furthermore, if it had been in error, the error would have been

harmless. The state court engaged in no explicit resolution, however, of the question of whether the restrictions on Howard's ability to put forward an expert witness or to cross-examine Dr. Martin were harmless.

■ When the state court concludes that any error was or would be harmless, that finding is subject to the same standard of deference as is any other legal conclusion. *Zappulla,* 391 F.3d at 467 (citing *Mitchell v. Esparza,* 540 U.S. 12, 124 S.Ct. 7, 157 L.Ed.2d 263 (2003) (*per curiam*)). That is, this court must find that the state court's harmless error determination, whether "the People proved 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained,'" was "objectively unreasonable." *Id.* (quoting *Mitchell,* 540 U.S. at 17–18, 124 S.Ct. 7).

Following AEDPA, this court has yet to define the standard of review appropriate to determine whether a non-structural constitutional error challenged on collateral review is harmless where the state court does not address the question of harmlessness. *See Benn v. Greiner,* 402 F.3d 100, 105 (2d Cir.2005); *Gutierrez v. McGinnis,* 389 F.3d 300, 306–07 n. 7 (2d Cir.2004); *Ryan,* 303 F.3d at 253–54. Prior to the passage of AEDPA, on collateral review, determination that an error was not harmless required a court to find that the error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht,* 507 U.S. at 623, 113 S.Ct. 1710 (quoting *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)). Alternatively, this court might apply AEDPA's standard of review for state court legal conclusions—whether the state court's resolution of legal questions "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law"—despite the fact that the state court did not reach a determination on the question of harmlessness. 28 U.S.C. § 2254(d)(1); *see Benn,* 402 F.3d at 105. Where the question has arisen, this court has declined to resolve it, finding instead that the harmlessness determination would be identical under either analysis. *Benn,* 402 F.3d at 105 (citing analogous cases).

**B. A Criminal Defendant's Rights Pursuant to *Bruton***

Howard's claims arise under the Sixth Amendment's Confrontation Clause, recently interpreted by the Supreme Court in *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). This court has previously determined that the holding of *Crawford* is irrelevant to our review of the state courts' analysis of a habeas petitioner's claim on the merits because the petitioner's conviction became final prior to the date of that ruling. *See Mungo v. Duncan,* 393 F.3d 327, 334 (2d Cir.2004). Therefore, this court takes the contours of Howard's Sixth Amendment rights as of the date that his conviction became final, considering whether the State court's "adjudication of the claim ... resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d).

Howard claims that his rights under the Sixth Amendment were violated by the trial court's ruling which allowed the State's expert witness to testify to an opinion based in relevant part on the otherwise inadmissible hearsay statement of Eric Williams. The Supreme Court has long held that the "the utterance of a co-conspirator made after the termination of the conspiracy was inadmissible against other co-conspirators." *Delli Paoli v. United States,* 352 U.S. 232, 239, 77 S.Ct. 294, 1

L.Ed.2d 278 (1957), *overruled on other grounds by Bruton*, 391 U.S. at 126, 88 S.Ct. 1620. Where two or more defendants are tried together, such a statement could be admissible against the declarant under the long-standing admissions exception to the hearsay rule. In *Delli Paoli*, the Court held that under such circumstances, the State could offer such a statement as evidence against the declarant and any prejudice to the other defendant could be overcome by a limiting instruction to the jury. *Id.* at 243, 77 S.Ct. 294. However, finding that a limiting instruction is insufficient to mitigate the prejudice to the co-defendant against whom such a statement is otherwise inadmissible, the Supreme Court has held that such statements are not admissible in a joint trial. *Bruton*, 391 U.S. at 126, 88 S.Ct. 1620.

The Supreme Court's firm stance on the inadmissibility of such statements is founded on the fact that the credibility of such statements "is inevitably suspect, a fact recognized when accomplices do take the stand and the jury is instructed to weigh their testimony carefully given the recognized motivation to shift blame onto others." *Id.* at 136, 88 S.Ct. 1620. The Sixth Amendment serves to ensure and protect the jury trial's fact-finding function. The Supreme Court has long concerned itself with the likelihood "that the admission of [co-defendants' statements] will distort the truthfinding process." *Lee v. Illinois*, 476 U.S. 530, 542, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986).

■ The confession of an accomplice is "presumptively unreliable." *Id.* In the context of an accomplice's confession, the Supreme Court has concluded that the "truthfinding function of the Confrontation Clause is uniquely threatened when an accomplice's confession is sought to be introduced against a criminal defendant without the benefit of cross-examination." *Id.* at 541, 106 S.Ct. 2056. "Due to his strong motivation to implicate the defendant and to exonerate himself," a co-conspirator's statement is "intrinsically much less reliable" than hearsay generally. *Bruton*, 391 U.S. at 141–42, 88 S.Ct. 1620 (White, J., *dissenting* ).

Constituting hearsay, Eric Williams' statement was admissible only if it bore independent indicia of reliability. *Ohio v. Roberts*, 448 U.S. 56, 66, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980); *see also Lee*, 476 U.S. at 539, 106 S.Ct. 2056. Prior to the Appellate Division's ruling, the Supreme Court had found "that certain hearsay exceptions rely upon such solid foundations that admission of virtually any evidence within them comports with the substance of the constitutional protection." *Roberts*, 448 U.S. at 66, 100 S.Ct. 2531 (internal quotation marks omitted). Therefore, if a hearsay declarant was unavailable to testify at trial where he would be subjected to the rigors of cross-examination, but the declarant's out-of-court statement bore "adequate 'indicia of reliability,' " a defendant's rights pursuant to the Sixth Amendment were not violated by the admission of the statement. *Id.* at 66, 100 S.Ct. 2531. Where there are "particularized guarantees of trustworthiness," *id.*, otherwise inadmissible hearsay was rendered admissible pursuant to *Roberts*.

As a preliminary matter, there are no such "particularized guarantees of trustworthiness" with respect to Eric Williams' confession.[3] The State does not argue as

---

3. The fact that the statements may have overlapped in some regard does not support a conclusion that any one of the statements was characterized by "particularized guarantees of trustworthiness." *See Idaho v. Wright*, 497 U.S. 805, 822, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990) ("To be admissible under the Confrontation Clause, hearsay evidence used to

such and no facts in the record support such a conclusion. Furthermore, the Supreme Court has consistently held that statements that inculpate both the declarant and another person ought to be considered with even greater suspicion than that applied to hearsay statements generally. *See Lilly v. Virginia*, 527 U.S. 116, 131–34, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999) (describing a long line of Supreme Court cases analyzing the inherent unreliability of such statements).

The facts of this case constitute a casebook example of the circumstances that would cause a court to question, as a matter of law, the reliability of a *Bruton*-infected statement. Significant admissible evidence, not the least of which was each defendant's signed and sworn confession, existed to support the conviction of one or all of Eric Williams, Daniel Williams, or John Howard for the burglary of Ms. Metz' home. The ability to convict one or more defendants on the charge of felony murder, however, was compromised by each man's incentive to lay blame for the death of Ms. Metz on the other two men. In New York State, an individual may be guilty of murder in the second degree where "[a]cting either alone or with one or more other persons, he commits or attempts to commit [an enumerated felony], and, in the course of and in furtherance of such crime or of immediate flight therefrom, he, or another participant, if there be any, *causes* the death of a person other than one of the participants." N.Y. Penal Law § 125.25(3) (2004) (emphasis added). The law also provides, however, an affirmative defense to felony murder. A defendant is not guilty of felony murder where he can prove that he:

(a) Did not commit the homicidal act or in any way solicit, request, command,

importune, cause or aid the commission thereof; and (b) Was not armed with a deadly weapon, or any instrument, article or substance readily capable of causing death or serious physical injury and of a sort not ordinarily carried in public places by law-abiding persons; and (c) Had no reasonable ground to believe that any other participant was armed with such a weapon, instrument, article or substance.

*Id.* The likelihood that the accused will prove the affirmative defense is immeasurably enhanced should he credibly attribute the "homicidal act" to one of his co-defendants.

The statements made and signed by Eric Williams, Daniel Williams, and John Howard following their arrest illustrate the incentives to distort the truth faced by co-conspirators following termination of a criminal conspiracy when that conspiracy is under investigation by law enforcement authorities. While each acknowledged his involvement in the burglary of Ms. Metz' home, Howard and Daniel Williams denied any interaction with Ms. Metz, physical, verbal, or otherwise. In addition, each of the three men suggested that the other two men may have climbed the stairs to the second floor of the house, where Ms. Metz was found dead, or had the opportunity to go upstairs while the declarant was either downstairs in the kitchen or just outside the house. Eric Williams admitted to going upstairs, but claimed that Howard physically assaulted Ms. Metz. His statement, constituting inadmissible hearsay, was not admissible against Howard. Indeed, admission of the statement would have proven "uniquely threaten[ing]" to the "truthfinding function of the Confrontation Clause." *Lee*, 476 U.S. at 541, 106

convict a defendant must possess indicia of reliability by virtue of its inherent trustworthiness, not by reference to other evidence at trial.").

S.Ct. 2056 (quoted in *Lilly,* 527 U.S. at 132, 119 S.Ct. 1887).

Because the defense did not contest that the medical cause of Ms. Metz' death was cardiac arrythmia, the material question was what had caused the cardiac arrythmia. While the State averred that stress resulting from the burglary caused Ms. Metz to suffer cardiac arrythmia, the defense asserted that no person could conclude with any degree of certainty what had brought on the arrythmia.

The trial court allowed an expert witness for the State, Dr. Jacqueline Martin, to testify to her opinion regarding the cause of Ms. Metz' death. In reaching an expert opinion on this question, Dr. Martin considered the police files and reports of the incident, which reports included the three statements of Howard, Eric Williams, and Daniel Williams.

The district court relied upon the state appellate court's finding that Dr. Martin's voir dire testimony established that her opinion "would be the same even without information obtained from the statement of one of the accomplices." *Howard,* 241 A.D.2d at 921, 661 N.Y.S.2d 386. The district court accepted this finding as correct in light of AEDPA's requirement that state court findings of fact are presumptively correct absent contrary "clear and convincing evidence." 28 U.S.C. § 2254(e)(1). *See Howard,* 2004 WL 1638197, at *6. However, this finding confuses the contours of Dr. Martin's opinion and its bases. The record clearly demonstrates that Dr. Martin's expert opinion on the cause of Ms. Metz' cardiac arrythmia, as heard by the jury, rested on Eric Williams' otherwise inadmissible statement.

As described above, Dr. Martin's opinion regarding Ms. Metz' death consisted of two parts. The first, that Ms. Metz' death was caused by a cardiac arrythmia, was not seriously contested by the defendant. Howard did, however, contest the second part of Dr. Martin's opinion, that the cardiac arrythmia was caused by stress resulting from the burglary. In the course of voir dire, Howard's counsel questioned Dr. Martin regarding the impact of the three men's statements on her opinion.

[Howard's Counsel:] Is your opinion as to cause of death in this case contingent to some degree upon the representations in Eric Williams' statement being true?

[Dr. Martin]: Yes.

Q. Okay. If those representations were not true, would that possibly change your opinion as to cause of death?

A. As to cause of death, I don't think so.

Trial Tr. at 515. When pushed to specify to what she understood "cause of death" to refer, however, Dr. Martin defined cause of death to mean "cardiac arrythmia, due to arteriosclerosis." Trial Tr. at 516. The fact that the immediate cause of Ms. Metz' death was cardiac arrythmia was not contested. Asked, on the other hand, whether she could, without relying on the *Bruton-*infected statements, "give an opinion to a reasonable degree of medical certainty as to whether, in fact, the house robbery brought about the cardiac arrythmia," Dr. Martin testified that she could not do so. Trial Tr. at 523.

There exists "clear and convincing evidence," indeed it is indisputable, that Dr. Martin's testimony that the burglary caused Ms. Metz' death relied on the *Bruton-*infected statement. On the basis of that statement, Dr. Martin testified before the jury that the burglary "was an important factor on Mrs. Metz' death." Trial Tr. at 574. The appellate division's ruling "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

28 U.S.C. § 2254(d)(2). Dr. Martin relied on inadmissible inherently unreliable hearsay in formulating an opinion to which she testified before the jury.

Experts are generally permitted to rely on otherwise inadmissible evidence in formulating an expert opinion: "expert witnesses can testify to opinions based on hearsay or other inadmissible evidence if experts in the field reasonably rely on such evidence in forming their opinions." *United States v. Locascio*, 6 F.3d 924, 938 (2d Cir.1993). Such reliance does not, as a rule, violate a defendant's Confrontation Clause rights. This court has previously concluded that "[i]t is rare indeed that an expert can give an opinion without relying to some extent upon information furnished him by others." *Reardon v. Manson*, 806 F.2d 39, 42 (2d Cir.1986), *cert. denied*, 481 U.S. 1020, 107 S.Ct. 1903, 95 L.Ed.2d 509 (1987). An expert may be permitted to rely on such information without interfering with a defendant's Sixth Amendment rights. *Id.* A defendant's rights under the Confrontation Clause are protected "where the expert is available for questioning concerning the nature and reasonableness of his reliance." *Id.*

A number of structural mechanisms ensure that an expert's reliance on hearsay furthers, rather than hinders, "the truth-finding process." *See Lee*, 476 U.S. at 541, 106 S.Ct. 2056. First, trial courts exercise the authority to ensure that an expert's testimony rests upon reliable bases and foundation. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147–49, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). Second, as an expert, the witness herself "is assumed 'to have the skill to properly evaluate the hearsay, giving it probative force appropriate to the circumstances.'" *Locascio*, 6 F.3d at 938 (quot-ing *In re "Agent Orange" Prod. Liab. Litig.*, 611 F.Supp. 1223, 1245 (E.D.N.Y. 1985), *aff'd*, 818 F.2d 187 (2d Cir.1987), *cert. denied*, 487 U.S. 1234, 108 S.Ct. 2898, 101 L.Ed.2d 932 (1988)). Third, expert witnesses are subject to cross-examination. *See United States v. Feliciano*, 223 F.3d 102, 121 (2d Cir.2000) (finding that constitutional problems raised by allowing a law enforcement agent to testify as both an expert and fact witness while relying on otherwise inadmissible hearsay were mitigated by "the opportunity, which [defense counsel] seized, to explore on cross-examination the limitations of [the witness'] experience and his testimony"). On cross-examination, an attorney is free to challenge an expert's methodology, her conclusions, and the bases for her conclusions. To the extent that the reliability of certain facts accepted by an expert is questionable, the exercise and process of cross-examination allow a defendant to bring any such factual disputes to the attention of the jury.

The factors generally relied upon to ensure that an expert's reliance on hearsay does not violate a defendant's rights under the Sixth Amendment did not exist in this case. The court's only voir dire question of Dr. Martin asked whether the statements of Daniel Williams, Eric Williams, and John Howard were "pieces of information that would be considered by other experts in the field of forensic pathology as important items to rely on in forming an opinion about the causation of death," a question Dr. Martin answered, "Yes." Trial Tr. at 524. Since the Supreme Court's ruling in *Daubert*, however, it has been clear that the fact that experts generally rely on a particular methodology or source of information is neither necessary nor sufficient to ensure admissibility at trial. *Daubert*, 509 U.S. at 588–89, 113 S.Ct. 2786. In this case, where the court was obligated to protect the defendant's Con-

frontation Clause rights, Dr. Martin's assurance that her methodology conformed with that of forensic pathologists generally was not sufficient to procure the admissibility of her opinion, where that opinion was based on a *Bruton*-infected statement.

While the *Bruton*-infected statements are presumptively unreliable, we decline to decide whether the admission of the State's expert testimony based on *Bruton*-infected statements is equivalent to the unconstitutional admission of a *Bruton*-infected statement. This court declines to determine whether admission of expert testimony based on a *Bruton*-infected statement violates a defendant's confrontation rights in every case. In this case, Howard was denied his right to cross-examine that witness or to rebut that witness' testimony by presenting his own expert witness. Because these denials, in and of themselves, constituted harmful constitutional errors, this court does not decide whether the admission of Dr. Martin's testimony, based on presumptively unreliable statements, had it not been accompanied by the court's limitations on Howard's rights to cross-examination and compulsory process, would have violated Howard's Confrontation Clause rights.

## C. The Trial Court's Limitations on Howard's Cross–Examination of Dr. Martin

A defendant in a state criminal prosecution has a right, guaranteed by the Sixth and Fourteenth Amendments to the Constitution, "to be confronted with the witnesses against him." U.S. Const. amend. VI; *see Pointer v. Texas*, 380 U.S. 400, 401, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965) (holding that the Sixth Amendment Confrontation Clause is made applicable to the states by the Fourteenth Amendment). "The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." *Maryland v. Craig*, 497 U.S. 836, 845, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990), *quoted in Lilly v. Virginia*, 527 U.S. at 123–24, 119 S.Ct. 1887. Trials are by their nature adversarial processes, and it is this adversarial nature that ensures the fulfillment of their truthfinding function. The Supreme Court has stated that:

> Confrontation: (1) insures that the witness will give his statements under oath—thus impressing him with the seriousness of the matter and guarding against the lie by the possibility of a penalty for perjury; (2) forces the witness to submit to cross-examination, the "greatest legal engine ever invented for the discovery of truth" . . . .

*California v. Green*, 399 U.S. 149, 150, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970) (quoting 5 J. Wigmore, Evidence § 1367 (3d ed.1940)).

■ This court considers Howard's right of cross-examination as it existed at the time his conviction became final. As previously described, *supra* at 124–25, the admission of an out-of-court statement may violate the Confrontation Clause. *Roberts*, 448 U.S. at 66, 100 S.Ct. 2531. Court-imposed limitations on cross-examination can also violate a defendant's Confrontation Clause rights. "[T]he right of cross-examination is included in the right of an accused in a criminal case to confront the witnesses against him." *Pointer*, 380 U.S. at 404, 85 S.Ct. 1065. "The right of cross-examination, though not absolute, is one of the most firmly established principles under Supreme Court law." *Cotto v. Herbert*, 331 F.3d 217, 248 (2d Cir.2003) (considering a petition for writ of habeas corpus under § 2254). As a result, "a denial of cross-examination without waiver . . . would be constitutional error of the

first magnitude ...." *Smith v. Illinois,* 390 U.S. 129, 131, 88 S.Ct. 748, 19 L.Ed.2d 956 (1968) (internal quotation marks omitted). Not inconsistent with a defendant's right to confrontation, "trial judges retain wide latitude ... to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall,* 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). Limitations on cross-examination may be lawful and legitimate if they are harmonious with the goal of ensuring the legitimacy of the truthfinding process. After all, "[t]he right of cross-examination ... is implicit in the constitutional right of confrontation, and helps assure 'the accuracy of the truth-determining process.'" *Chambers v. Mississippi,* 410 U.S. 284, 295, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973) (quoting *Dutton v. Evans,* 400 U.S. 74, 89, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970)).

Accordingly, while the right to cross-examination is not absolute, it is effectively denied when a defendant is prohibited from "expos[ing] to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness." *Davis v. Alaska,* 415 U.S. 308, 318, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). If a defendant is prevented from doing so, he "states a violation of the Confrontation Clause." *Van Arsdall,* 475 U.S. at 680, 106 S.Ct. 1431. In this case, Howard was not able to engage in cross-examination of Dr. Martin that would shed light on her reliability by questioning her methodology, the factual bases upon which she rested her conclusion, or the soundness of the opinion itself.

Here, the trial court's ruling that, if the defense challenged the basis of Dr. Mar-

tin's opinion, the State would be permitted to admit Eric Williams' statement in its entirety, offered Howard a constitutionally-impermissible choice. The court required Howard to choose between his Sixth Amendment right to cross-examine Dr. Martin, and his Sixth Amendment right to exclude the unreliable hearsay confession of a co-conspirator. The Supreme Court has recognized that a court may not subject a defendant to such a sacrifice. *Simmons v. United States,* 390 U.S. 377, 394, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968) ("[W]e find it intolerable that one constitutional right should have to be surrendered in order to assert another.").

This court recognizes that the *Simmons* principle has not widely been applied in the Sixth Amendment context. *United States v. Harris,* 707 F.2d 653, 663 (2d Cir.1983) (citing *United States v. Kahan,* 415 U.S. 239, 242–43, 94 S.Ct. 1179, 39 L.Ed.2d 297 (1974)), *cert. denied,* 464 U.S. 997, 104 S.Ct. 495, 78 L.Ed.2d 688 (1983). This court has previously determined that a criminal defendant's testimony at a hearing held to determine whether he qualifies for appointment of counsel cannot be used as part of the government's case against him. *Harris,* 707 F.2d at 662–63. The Supreme Court, however, in *Kahan,* declined to apply the *Simmons* principle where a criminal defendant's statements on a financial disclosure form, completed for the purposes of exercising his Sixth Amendment right to counsel, were admitted against him at trial not for the purposes of establishing the truth of the statements, but for the purposes of establishing defendant's knowledge that such statements were false. *Kahan,* 415 U.S. at 242–43, 94 S.Ct. 1179. The Supreme Court determined that the criminal defendant faced no "intolerable choice" of the sort that *"Simmons* sought to relieve." *Id.* at 243, 94 S.Ct. 1179. In making the

false financial disclosure, the defendant did not exercise "what was 'believed' by the claimant to be a 'valid' constitutional claim." *Id.*

The instant case is more analogous to *Simmons* than it is to *Kahan*. Kahan had no right to state-provided counsel as he was not in reality indigent. Howard did have an absolute right under *Bruton* [4] and to exercise the rights to confrontation and compulsory process. Furthermore, the inability to cross-examine Dr. Martin or to present Dr. Abbott's testimony were "essential to [Howard's felony murder] conviction" and "had a prejudicial impact on the jury's deliberations on [that] charge." *United States v. Hardwell*, 80 F.3d 1471 (10th Cir.1996) (citing, *inter alia, Harris*, 707 F.2d at 662–63 to support a holding that a defendant cannot be "forced to choose between the Sixth Amendment right to counsel and the Fifth Amendment right against self-incrimination."). Accordingly, the *Simmons* principle is particularly apt in this case. Therefore, this court examines the choice posed to Howard as it would an outright limitation on his right to cross-examination or, as discussed *infra* at 131, his right to present a defense.

By conditioning Howard's right to cross-examine Dr. Martin on the surrender of another constitutional right, the court effectively foreclosed Howard's opportunity to engage in cross-examination that would challenge "the nature and reasonableness of [Dr. Martin's] reliance" on Eric Williams' statement, or any other basis upon which she reached her conclusion. *Reardon*, 806 F.2d at 42. As discussed *supra* at 127–28, the trial court's limitation on Howard's cross-examination of Dr. Martin was particularly harmful to the

truthfinding process given her reliance upon unreliable hearsay in forming her expert opinion. Even setting aside, however, the constitutional implications of allowing Dr. Martin to testify to an opinion based upon *Bruton*-infected statements, the court's limitation on Howard's cross-examination of Dr. Martin was an unreasonable denial of Howard's rights under the Confrontation Clause.

In this case, the trial court barred Howard from engaging in even the most basic cross-examination of Dr. Martin, thereby gutting the function of cross-examination, "the principal means by which the believability of a witness and the truth of his testimony are tested." *Davis*, 415 U.S. at 316, 94 S.Ct. 1105. The trial judge's ruling barred areas of cross-examination that went to the reliability of Dr. Martin's conclusion itself as well as to the basis of her opinion. Howard was not permitted to question her conclusions or the information on which they were based in any way without risking the admission into evidence of Eric Williams' statement. The court found that, if Howard attempted to establish that it was possible that Ms. Metz would have suffered a heart attack even in the absence of a burglary, the State would be permitted to present Eric Williams' statement to the jury.

The district court, in denying Howard's petition, noted that "the ruling by the trial judge here did not restrict or preclude defense counsel from engaging in cross-examination or challenging the veracity of Dr. Martin. Rather, the trial court's ruling simply defined an inevitable consequence should defense counsel pursue a particular line of impeachment question-

---

4. While there are exceptions that may allow a statement otherwise inadmissible under *Bruton* to be admitted into evidence, none of those exceptions apply in this case. There is no question that in this case, Howard had an absolute right to exclude such statement under *Bruton*.

ing."[5] *Howard v. Walker*, No. 98–CV–6427Fe, slip op. at 12 (W.D.N.Y. June 26, 2001). The district court found that the trial judge "fashioned a remedy that balanced the defendant's *Bruton* rights with his right to effective cross-examination." *Id.*, slip op. at 13. The trial court's ruling can hardly be considered a balancing, however, where the only entitlements compromised belonged to the defendant.

The trial court did not simply define an inevitable consequence of cross-examination. The trial court's rulings on what constitutes "opening the door" failed to consider the serious constitutional violation in conditioning the opportunity for cross-examination on Howard's waiver of his *Bruton* rights. Howard was entitled to exclusion of Eric Williams' out-of-court statement and in making exclusion of such statement contingent upon Howard's sacrifice of another equally fundamental constitutional right, the trial court denied Howard rights guaranteed by "one of the most firmly established principles under Supreme Court law." *Cotto*, 331 F.3d at 248. In light of longstanding Supreme Court precedent, the trial court's ruling "involved an unreasonable application of[ ] clearly established Federal law" and, therefore, cannot withstand collateral review. *See* 28 U.S.C. § 2254(d)(1).

### D. Howard's Inability to Call an Expert Witness

The trial court's ruling that, were Howard to call Dr. Abbott to testify, the prosecution could introduce the substance of Eric Williams' statement through cross-examination effectively prohibited Howard from presenting Dr. Abbott's testimony to the jury. Howard argues this ruling denied him the right to a fair opportunity to defend himself against the State's accusations.

■ The right at issue arises from the right to compulsory process under the Sixth Amendment. "In all criminal prosecutions, the accused shall enjoy the right ... to have compulsory process for obtaining witnesses in his favor ...." U.S. Const. amend. VI. "The right to call witnesses in order to present a meaningful defense at a criminal trial is a fundamental constitutional right secured by both the Compulsory Process Clause of the Sixth Amendment and the Due Process Clause of the Fourteenth Amendment." *Washington v. Schriver*, 255 F.3d 45, 56 (2d Cir.2001) (citing Supreme Court cases). "Few rights are more fundamental than that of an accused to present witnesses in his own defense." *Taylor v. Illinois*, 484 U.S. 400, 408, 108 S.Ct. 646, 98 L.Ed.2d 798 (1987). This right protects, among other things, the truth-finding process. "The ends of criminal justice would be defeated if judgment were to be founded on a partial or speculative presentation of the facts." *Id.* at 409, 108 S.Ct. 646 (quoting *United States v. Nixon*, 418 U.S. 683, 709, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974)). To those ends, "[t]he rights to confront and cross-examine witnesses and to call witnesses in one's own behalf has long been recognized as essential to due process." *Chambers*, 401 U.S. at 294, 91 S.Ct. 633.

However, "[t]he accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible," and his right may yield to rules and procedure of the adversary process that "provide each party with a fair opportunity to assemble and submit evi-

---

**5.** On remand, the district court adopted its reasoning expressed in its original Decision on the question of whether Howard's right to cross-examine Dr. Martin was unconstitutionally limited. See *Howard*, 2004 WL 1638197, at *7.

dence to contradict or explain the opponent's case." *Taylor*, 484 U.S. at 410–11, 108 S.Ct. 646. A trial court may consider the "the broader public interest in a full and truthful disclosure of critical facts." *See id.* at 412, 108 S.Ct. 646. Restrictions on a defendant's right under the Sixth Amendment to introduce testimony on his behalf, however, "may not be arbitrary or disproportionate to the purposes they are designed to serve." *Rock v. Arkansas*, 483 U.S. 44, 55–56, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987).

▇▇▇▇ To establish a Sixth Amendment violation, a defendant must demonstrate that he was deprived of the opportunity to present a witness who would have provided testimony that was "both material and favorable to his defense." *United States v. Valenzuela–Bernal*, 458 U.S. 858, 867, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982). Materiality requires that "the omission ... be evaluated in the context of the entire record." *Id.* at 868, 102 S.Ct. 3440. When considering whether a trial court's exclusion of expert witness testimony violated a criminal defendant's right to Compulsory Process, a two-step analysis is appropriate. First, we consider the trial court's reasons for excluding the evidence. Second, we consider the strength of the prosecution's case as a whole. *See Washington*, 255 F.3d at 59; *Agard v. Portuondo*, 117 F.3d 696, 705–07 (2d Cir.1997) (citing *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976)), *rev'd on other grounds*, 529 U.S. 61, 120 S.Ct. 1119, 146 L.Ed.2d 47 (2000).

In this case, the trial court ruled that, were Howard to call an expert witness, the court would allow that expert to be cross-examined using the *Bruton*-infected statement.

[Howard's Counsel]: My understanding, Judge, if I were to call a medical expert on behalf of defendant, that the People would be permitted to cross-examine him relating to the basis of his opinion and using the co-defendants' [*Bruton*-infected] statements and the particular information contained in those statements; is that right?

THE COURT: Yes, for the reasons I have already stated.

Trial Tr. at 532. The testimony of Dr. Abbott was clearly favorable to the defense. Through that testimony, Howard sought to establish that Ms. Metz' death may have occurred even if there had been no burglary, thus supporting a reasonable doubt regarding his guilt. While Howard had no obligation to come forward with evidence, the Constitution entitled him to the opportunity to challenge the State's evidence against him. Without Dr. Abbott's testimony, which controverted the State's case in favor of Murder in the Second Degree as well as Burglary in the First Degree, Howard had no opportunity to contest Dr. Martin's testimony that she could, to a degree of reasonable certainty, draw a conclusion regarding Howard's role in causing Ms. Metz' cardiac arrythmia. Furthermore, Dr. Abbott's testimony supported Howard's only available defense to the felony murder charge. Therefore, the omitted evidence, particularly as it would have been provided by a medical expert, "create[d] a reasonable doubt that did not otherwise exist" and, as such, "constitutional error has been committed." *Agurs*, 427 U.S. at 112, 96 S.Ct. 2392. Furthermore, while the State's case in support of Howard's role in the burglary was substantial, its case supporting both felony murder and the *physical injury* element of Burglary in the First Degree was speculative and circumstantial. Under such circumstances, the crucial role Dr. Abbott's testimony would have played in Howard's defense should not be minimized.

The instant case is easily distinguishable from *Washington*, in which this court found that exclusion of a defendant's expert was not constitutional error because the defendant was not deprived of the opportunity to make the argument that was supported by the expert's testimony. *Washington*, 255 F.3d at 60. In that case, the defendant sought to establish, through expert testimony, that a young victim's testimony was unreliable. The *Washington* court was able to list "the myriad ways" in which the defendant had put evidence regarding the witness' unreliability before the jury, including witnesses' accounts of inconsistent statements by the young witness to a social worker and an assistant district attorney, the defendant's cross-examination of the young victim, and the simple fact that the victim's age was itself evidence that the jury could consider. *Id.* at 60–61. This court can point to no such analogous opportunities to present the relevant argument in this case. Given the trial court's ruling, Howard could not cross-examine Dr. Martin's analysis of the cause of Ms. Metz' cardiac arrythmia. Nor could anyone other than a medical expert seriously rebut Dr. Martin's testimony regarding causation. The omitted testimony of Dr. Abbott was both material and favorable to Howard's case.

In spite of the materiality and favorableness of Dr. Abbott's testimony, it is possible that the trial court excluded such testimony "to accommodate other legitimate interests in the criminal trial process." *Rock*, 483 U.S. at 56, 107 S.Ct. 2704. So long as restrictions designed to accommodate such interests were not arbitrary or disproportionate, they were within the trial court's discretion. *Id.* at 55–56, 107 S.Ct. 2704. In this case, however, there were no legitimate competing interests. The trial court was clearly concerned about fairness to the prosecution, as the court perceived it. There is no "legitimate interest[ ] in the criminal trial process," however, in admitting evidence that is unreliable as a matter of law. *Id.* at 56, 107 S.Ct. 2704. The presentation to the jury of incompetent and inadmissible evidence does not further the determination of truth and cannot constitute such an interest. Therefore, the trial court's prohibition-in-fact of Dr. Abbott's testimony was an unreasonable denial of Howard's clearly established constitutional rights.

## E. Harmless Error

Having determined that the trial court's exclusion of Dr. Abbott's testimony and the limitations on cross-examination of Dr. Martin were "contrary to, or involved an unreasonable application of, clearly established Federal law," 28 U.S.C. § 2254(d)(1), the court turns to the question of whether such errors were harmless. The state court reached no harmlessness determination with respect to either of these errors. Because neither error can be considered harmless under any of the standards potentially applicable, *see supra* at 123, the court does not need to reach a conclusion regarding the correct standard in this case.

Howard's ability to cross-examine Dr. Martin was unconstitutionally compromised. Whether an unconstitutional limitation on a defendant's cross-examination of a witness is harmless "depends upon a host of factors" which

> include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

*Van Arsdall,* 475 U.S. at 684, 106 S.Ct. 1431. The trial court's limitations on Howard's cross-examination of the State's expert did not address a "collateral matter," but went to the heart of Dr. Martin's testimony. *Cf. Tinsley v. Kuhlmann,* 973 F.2d 163, 166 (2d Cir.1992). Unless the jury found that the burglary caused Ms. Metz' arrythmia and thus her death, Howard could not be convicted of felony murder or first degree burglary. Therefore, his inability to challenge Dr. Martin's opinion to that effect significantly impaired his ability to cross-examine Dr. Martin effectively.

In addition, the trial court placed unconstitutional limitations on Howard's ability to call his own expert witness. Whether such error was harmless depends on Howard's ability to make the argument supported by his expert witness, despite the exclusion of that witness. *See Agard,* 117 F.3d at 706–07. In this case, Dr. Abbott's testimony cannot be described as "cumulative." *See Agurs,* 427 U.S. at 114, 96 S.Ct. 2392. Given the trial court's rulings with regard to the *Bruton*-infected statements, no witness testified and no physical evidence could be marshaled in support of Howard's contention that no person could conclude with any degree of certainty that the burglary caused Ms. Metz' death.

▇ To support its position that the trial court's error with respect to cross-examination of Dr. Martin and Howard's ability to call Dr. Abbott was harmless, the State contends that there was overwhelming evidence of Howard's guilt and that it is unlikely that Howard's expert would have testified that the State's theory of the case, that Ms. Metz suffered stress which led to her death, was impossible. The State's analysis overstates its case and ignores the evidentiary burden in a criminal case. Howard need not prove that it was impossible for the robbery to have resulted in Ms. Metz' death. The jury need only have found reasonable doubt to that effect. Howard's expert witness, Dr. Abbott, would have testified that "it is not possible to say with certainty that this criminal encounter was the cause of arrythmia and that it would not have occurred without the encounter." Dr. Abbott's Ltr., December 19, 1990. Had she been subject to cross-examination, or limited in her reliance on *Bruton*-infected statements, Dr. Martin would have testified similarly. Both medical experts, outside of the jury's presence, expressed serious doubt on their ability to reach a conclusion on the timing and causation of Ms. Metz' death without reference to an inherently unreliable *Bruton*-infected statement and even with the *Bruton*-infected statement, Dr. Abbott concluded that he could not reach any such conclusion to any degree of medical certainty.[6]

The jury never heard either expert express such serious doubts. At trial, Howard did not contest his participation in the burglary of Ms. Metz' home. It could be argued that the jury had sufficient evidence on the basis of which to determine that Ms. Metz died as a result of the burglary of her house. In this case, however, where a medical expert testified to that causal element, it clearly cannot be said that the infringements on Howard's right to cross-examine that expert or to provide his own expert to the contrary constituted harmless errors. The evidence supporting Howard's conviction for murder was entirely circumstantial. Cross-examination casting doubt on a medical doctor's ability to tie the burglary to the

---

**6.** These statements demonstrate that Dr. Abbott, unlike Dr. Martin, did not base his opin-
ion on *Bruton*-infected statements in relevant part.

death was, therefore, crucial to Howard's ability to put forward a defense.

Absent the ability to cross-examine Dr. Martin effectively or to provide an expert to rebut Dr. Martin's testimony, as was his right under the United States Constitution, Howard's ability to create reasonable doubt was severely restricted. The trial court's restrictions on Howard's cross-examination and presentation of evidence undermined his ability to challenge the factual basis for the charges of felony murder and burglary[7] or to lay a foundation for his affirmative defense to those charges. Although the trial court remarked that the fact that a heart attack can occur without a precipitating event is something of which all jurors must be aware, that assumption does not eviscerate the value of expert testimony supporting the inability of any doctor to reach a conclusion regarding the existence or nature of a precipitating event, let alone an unchallenged opinion that such a causal connection existed in this case. In addition to barring any evidence which would tend to establish that Ms. Metz' heart attack may not have been caused by the burglary, the court's limitations on cross-examination prevented Howard from mounting any challenge whatsoever to Dr. Martin's conclusion to the contrary. Because these issues lay at the heart of the charges of Murder in the Second Degree and Burglary in the First Degree against Howard and his efforts to establish the affirmative defense to Murder in the Second Degree, the errors cannot reasonably be considered harmless.

### III. CONCLUSION

Having found that the state court based its decision on an unreasonable determination of the facts in light of the evidence before it and unreasonably applied the governing federal law as defined by the United States Supreme Court and having determined that such errors were not harmless, we REVERSE the district court's denial of a writ of habeas corpus. We amend our Order of March 7, 2005 and remand the case to the district court with directions to grant a writ of habeas corpus directing petitioner's release from custody (Howard having already served his sentence on the counts as to which no relief is sought) unless within ninety days of the date of the writ, Howard is retried in New York State Supreme Court on Murder in the Second Degree (N.Y. Penal Law § 125.25[3] ), or Burglary in the First Degree (N.Y. Penal Law § 140.30), or both.

The State shall have fourteen days after the issuance of this opinion to file any petition for rehearing en banc. Any pending motions are moot.

---

**7.** While the State need not have proven that the Howard caused physical injury to a person to prove the lesser included charge of Burglary in the Second Degree, such physical injury was a necessary element of the State's charge of Burglary in the First Degree. *See* N.Y. Penal Law § 140.30; *compare* N.Y. Penal Law § 140.25.