Domenick CRISPINO, Petitioner,

v.

Michael J. ALLARD, Superintendent of
Franklin Correctional Facility,
Respondent.

No. 04 CIV. 0343(RWS).

United States District Court,
S.D. New York.

July 21, 2005.

Domenick Crispino, Malone, NY, Petitioner Pro se.

Eliot Spitzer, Attorney General of the State of New York by Luke Martland, Esq., Assistant Attorney General, New York City, for Respondent.

*OPINION*

SWEET, District Judge.

Domenick Crispino ("Crispino" or the "Petitioner"), appearing *pro se*, has petitioned for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 alleging that he is being held in state custody in violation of his constitutional rights. The respondent Michael J. Allard, Superintendent of Franklin Correctional Facility (the "Superintendent" or the "State") has opposed the petition. For the reasons set forth below, the petition is denied. Furthermore, Crispino's February 28, 2005 letter motion for leave to demand documents is also denied.

### *Prior Proceedings*

Three judgments were entered against Crispino on January 9, 2001, in New York State Supreme Court, New York County. By the first judgment, Crispino was convicted, after a jury trial, of the following charges contained in New York County Indictment Number 8550/98: one count of grand larceny in the second degree (N.Y. Penal Law § 155.40(1)); two counts of grand larceny in the third degree (N.Y. Penal Law § 155.35); and two counts of criminal possession of a forged instrument in the second degree (N.Y. Penal Law § 170.25). Crispino was sentenced under the first judgment to an indeterminate prison term of five to fifteen years on the second-degree grand larceny charge, and he was also sentenced to four concurrent prison terms of two to six years on the remaining charges. The latter four terms ran consecutive to the term imposed on the second-degree grand larceny charge.

By the second judgment, Crispino was convicted upon his plea of guilty of the following charges contained in New York County Indictment Number 4090/99: one count of criminal possession of stolen property in the second degree (N.Y. Penal law § 165.52), two counts of grand larceny in the third degree, six counts of forgery in the second degree (N.Y. Penal Law § 170.10(1)) and three counts of criminal possession of a forged instrument in the

second degree. On this judgment, Crispino received an indeterminate prison term of five to fifteen years on the second-degree possession of stolen property charge, and he received eleven concurrent two to six year terms on the remaining counts. The eleven concurrent terms ran consecutive to the term imposed on the second-degree possession of stolen property charge.

By the third judgment, Crispino was convicted upon his plea of guilty of the following charges contained in New York County Indictment Number 8223/99: four counts of grand larceny in the second degree, four counts of criminal possession of stolen property in the second degree, ten counts of grand larceny in the third degree, ten counts of criminal possession of stolen property in the Third Degree (N.Y. Penal Law § 165.50), and forty-one counts of criminal possession of a forged instrument in the second degree. On this judgment, Crispino was sentenced to concurrent indeterminate prison terms of five to fifteen years on the four second-degree grand larceny counts. Consecutive to these four concurrent terms, Crispino was sentenced to sixty-five concurrent indeterminate terms of two to six years on the remaining counts.

The aggregate sentences on all of the indictments were to run concurrently.

Crispino's convictions were affirmed by the Appellate Division, First Department, and leave to appeal to the New York Court of Appeals was denied on March 12, 2003. *People v. Crispino*, 298 A.D.2d 220, 748 N.Y.S.2d 718 (1st Dep't 2002), *leave denied*, 99 N.Y.2d 627, 760 N.Y.S.2d 108, 790 N.E.2d 282 (2003). Crispino is currently incarcerated at Franklin Correctional Facility in Malone, New York as a result of the judgment of conviction.

Crispino filed his petition for a writ of habeas corpus on January 15, 2004. In his petition, Crispino stated that: (1) the trial judge wrongfully precluded him from raising and pursuing a defense attacking the motives of the complainant and the prosecution after he outlined this defense in his opening statement and the People had failed to object; (2) by two comments made during Crispino's closing argument, the trial judge improperly shifted the burden of proof; (3) the trial judge improperly excluded relevant and exculpatory evidence; (4) the state courts failed to give him a full and fair opportunity to litigate his Fourth Amendment claims; (5) the Appellate Division wrongfully held that his guilty pleas waived his geographical jurisdictional challenge; (6) the trial judge erred in the charge to the jury; and (7) his conviction was not supported by legally sufficient evidence.

The State filed its opposition on June 10, 2004, and Crispino filed his reply on July 6, 2004, at which time the petition was marked fully submitted.

The State has conceded that the petition is timely and that Crispino has exhausted his claims.

### The Facts

By New York County Indictment Number 8550/98, filed on October 21, 1998, Crispino, an attorney with offices in Manhattan, was charged with one count of grand larceny in the second degree, two counts of grand larceny in the third degree, one count of criminal possession of stolen property in the second degree, two counts of criminal possession of stolen property in the third degree, and two counts of criminal possession of a forged instrument in the second degree arising out of Crispino's conduct as an attorney.

By New York County Indictment Number 4090/99, filed on June 16, 1999, Crispino was charged with one count of criminal possession of stolen property in the second

degree, two counts of grand larceny in the third degree, six counts of forgery in the second degree, and three counts of criminal possession of a forged instrument in the second degree in connection with his thefts from clients Kevin Fuseyamore and Felipe Pena.

By New York County Indictment Number 8223/99, filed on November 1, 1999, Crispino and Cel Stuart, his associate, ("Stuart") were each charged with single counts of grand larceny in the first degree (N.Y. Penal Law § 155.42) and criminal possession of stolen property in the first degree (N.Y. Penal Law § 165.54), seven counts each of grand larceny in the second degree and criminal possession of stolen property in the second degree, and 41 counts of criminal possession of a forged instrument in the second degree, in connection with the settlement of litigation for 14 disabled and injured clients against J.G. Wentworth, a specialty finance company.

Subsequently, on Crispino's motion to inspect the grand jury minutes for Indictment Number 8223/99, the count of first-degree grand larceny was reduced to second-degree grand larceny and the count of first-degree possession of stolen property to second-degree possession. Four counts of second-degree grand larceny were also reduced to third-degree grand larceny and four counts of second-degree possession of stolen property were reduced to third-degree possession. On June 30, 2000, Stuart pled guilty to one count of grand larceny in the second degree, and on October 20, 2000, he was sentenced to an indeterminate prison term of one to three years.

Prior to trial on Indictment Number 8550/98, Crispino moved to suppress documents and records that he claimed had been improperly obtained. After hearings on August 7, 2000 and September 22, 2000, the motion judge denied Crispino's motion and on September 22, 2000, Crispino proceeded to trial on Indictment Number 8550/98.

Unless otherwise noted, the following facts are drawn from the trial transcript.

At the trial, Florence Furino ("Furino") testified that she retained Crispino to represent her on the appeal of a judgment rendered against her in Queens, New York in connection with a real estate transaction and agreed to pay Crispino a flat fee of $2,500 to represent her. In order to prevent her adversary from satisfying the judgment while the appeal was pending, Furino was required to purchase a bond. Accordingly, on September 23, 1996, Furino's daughter gave Furino a check for $25,000. Furino made the check payable to "Domenick Crispino as attorney," and it bore the notation, "Partial Escrow for Tepper," who was the person to whom Furino owed the judgment. Crispino promised to keep the $25,000 check in his Interest On Lawyer Account (the "IOLA account"),[1] and if she lost her appeal, to apply the money and the interest against the judgment. Crispino stated that if Furino prevailed on appeal, he would return the money to her.

Crispino filed an appellate brief and a reply brief on Furino's behalf and told Furino that he would orally argue the case in May 1997, although no decision was likely to be rendered until November or December. At some point in the spring of 1997, Crispino told Furino that he had missed the oral argument date, but that he would make a motion to reargue.

1. An IOLA account is an interest-bearing escrow account an attorney uses to hold client funds or fiduciary funds until the parties to a given transaction or litigation agree to have the attorney release the funds. Without that release, an attorney is not permitted to remove funds from an IOLA account.

In October 1997, Furino received a bill from the bonding company for their yearly fee and tried to contact Crispino to find out what to do. In October and November 1997 and again in January 1998, Furino called Crispino numerous times (eventually up to twenty times a day), leaving messages on Crispino's answering machine or with whomever answered the telephone, but Crispino never returned any of her calls. At some point, Furino called "the court" and learned that her appeal was no longer pending and that the motion to reargue had been denied in June 1997. She twice wrote Crispino, telling him that she knew that her case had been lost and asking what would happen with the bond.

In January 1998, Crispino telephoned Furino and assured her that they would prevail on a new motion that he planned to make in the New York Court of Appeals. However, in May 1998, Furino received letters from the bonding company, Fidelity Insurance, asking for $45,708, including the $25,000 that Crispino held in escrow, because the case was over and her adversary wanted his money. At the behest of Fidelity, Furino twice wrote to Crispino at his business address, asking him to release the $25,000 from escrow to the insurance company, but Crispino never responded and never paid the insurance company. On December 15, 1998, a law firm representing Fidelity also sent a letter to Crispino, requesting that he pay them the money held in the escrow account on Furino's behalf, but Crispino never made any payment to Fidelity.

At trial, Merri Jurasin ("Jurasin") testified that in October 1995, she was a waitress living in New Jersey. She was contacted by Robert Curran ("Curran"), an attorney with offices in New Jersey who sought to represent Jurasin in a suit against New York City concerning injuries that Jurasin had suffered in a fall on a Manhattan sidewalk. Jurasin and Curran agreed that Curran would be paid a fee of one-third of Jurasin's net recovery from the lawsuit less Curran's actual costs. Although Curran was admitted to the New York bar, he did not regularly practice there. He contacted Crispino, who had been a law school classmate to help him prepare documents and file a Notice of Claim against the City.

Since Curran lacked experience litigating cases in New York, when it became clear that a formal lawsuit would have to be filed, he suggested, and Jurasin agreed, that the case be turned over to Crispino and also that Crispino and Curran split equally the one-third attorney's fee.

In September 1996, Crispino filed a lawsuit on Jurasin's behalf against the City of New York. In February 1997, Crispino informed Jurasin and Curran that the City had offered to settle the case for $50,000, and Jurasin agreed to accept the settlement. Crispino sent Jurasin a "General Release" form, which he told her to sign in order to get the settlement money from the City. Jurasin signed and notarized the release and returned it to Crispino at his Manhattan office.

Shortly after, Crispino told Jurasin that she would "eventually" get her money. Over the next few months, Jurasin called Crispino several times to ask about her money, but by June 1997, Crispino had stopped taking her calls. Throughout the summer of 1997, Jurasin repeatedly called and left messages with Crispino's secretary, who assured Jurasin that she was giving Crispino the messages. However, Crispino never returned her calls.

Meanwhile, on June 16, 1997, the New York City Comptroller's Office had issued a check in the amount of $32,278.14, payable to "Merri Jurasin, c/o Domenick Cris-

pino, Esquire." [2] On June 19, 1997, Crispino deposited the check, endorsed with his own signature and with Jurasin's purported signature, into his IOLA account.

During the summer of 1997, Jurasin also called Curran repeatedly, asking why Crispino was not returning her calls and why the settlement payment was delayed. In August and September 1997, Curran called Crispino several times to ask about the status of the settlement and was told by Crispino that he had not received a check from the City. Crispino explained that the City was not required to pay the money for ninety days after the date of the settlement, and assured him that if the City took more than ninety days, it would be required to pay interest on the money. Eventually, however, Crispino stopped returning Curran's calls. In October and November 1997, Curran wrote Crispino three letters warning him that his failure to respond to his and Jurasin's telephone calls was improper. In November 1997, Curran contacted the New York City Comptroller's Office and learned that the settlement checks had been sent on June 16, 1997.

At Curran's request, the Comptroller's Office sent him a copy of the front and back of the cancelled settlement check. In December 1997, Jurasin went to Curran's office, where he showed her the check. The back of the check contained two signatures, "Merri Jurasin" and "Domenick Crispino." Jurasin had never seen the check before and had not known that the City had issued it. She had not (1) endorsed the back of the check, (2) permitted Crispino to sign her name to the check or to take any portion of the settlement other than the agreed-upon attorney's fee, or (3) ever agreed to loan Crispino the proceeds

of the settlement. On December 17, 1997, Curran sent a copy of the endorsed check to Crispino. Curran told Crispino that Jurasin had denied signing the check and that he had made an ethics complaint to the Departmental Disciplinary Committee of the First Judicial Department (the "DDC").

At trial, Carla Iannone ("Iannone") testified that in October 1992, she decided to sue her former employer, Frederick R. Harris, Inc. ("Harris"), for sexual harassment and wrongful termination, and hired Crispino, her husband's high school friend whom she had known for over a decade. Iannone and Crispino agreed orally that Crispino would represent Iannone on a contingency basis, and that he would receive one-third of any award or settlement as his fee.

After a trial in federal court in June 1996, Iannone prevailed on the wrongful termination claim and was awarded $317,000 in compensatory and punitive damages. However, upon motion by Harris' counsel Amy Beech ("Beech"), the trial judge reduced the award to approximately $78,000 plus interest.

In October 1996, Iannone told Crispino that she was upset and wanted to challenge the reduction. Crispino agreed to appeal the case on her behalf. Iannone understood that she would pay him no more than the previously agreed-upon fee and that Crispino would seek reimbursement for additional attorney's fees from Harris.

In February 1997, Crispino sent Beech an amended judgment form, reciting, among other things, that the total amount of the judgment against Harris, including interest, was $85,745.09. In response to

---

**2.** In addition to the above-described $32,478.14 payment to Jurasin, the Comptroller's Office issued a check for the balance of

the settlement to a company in New Jersey to which Crispino had sold his anticipated fees.

Crispino's inquiry several months later, Beech obtained a check on June 30, 1997, in the amount of $85,745.09 payable to "Domenick Crispino, Esq., as attorney for Carla Iannone" and mailed it to Crispino at his Manhattan office in early July 1997.

Beech also sent Crispino a satisfaction of judgment form for Iannone to sign. When Beech had not received the signed form after "some time," she contacted Crispino. In September 1997, Crispino sent Beech a photocopy of the satisfaction of judgment form, signed with the name "Carla Iannone," and notarized by Crispino on August 8, 1997. Crispino included a handwritten note in which he claimed that he had sent the signed original in early August. Beech never received an original of the satisfaction of judgment from Crispino. Pursuant to Crispino's authorization, she filed the copy with the court as proof that the judgment had been paid.

Over the year and a half after Crispino agreed to appeal the case, Iannone telephoned Crispino "every few months" to check on the status of the appeal, but each time they spoke, Crispino told her the appeal was still pending. Their last conversation was in February 1998, when Crispino told her that the appeal was still pending and that he hoped that it would be resolved before the summer. In April and May 1998, Iannone telephoned Crispino "dozens of times," leaving messages, but Crispino never returned her calls. Finally, Iannone called the Court of Appeals to find out the status of the appeal and was told that the "matter was over" and the appeal had been dismissed.

In June 1998, Iannone wrote Crispino by certified mail and asked him to explain what had happened and whether he had received any money. Receiving no response from Crispino, Iannone hired another attorney, Michael Coscia ("Coscia"), to determine whether a payment had been

made. Coscia unsuccessfully attempted to contact Crispino, then spoke with Beech, who had told him that an $85,745.09 check had been sent to Crispino on Iannone's behalf. Coscia obtained a copy of the cancelled check and a copy of the satisfaction of judgment form and showed them to Iannone, who had never seen either one. The signature on the satisfaction of judgment form was "a likeness" of Iannone's signature, but she had not met with Crispino on August 8, 1997, and she had not signed the form. She did not give Crispino permission to sign the form or any other document on her behalf, nor had she given him authority to accept the reduced jury award on her behalf or to keep the proceeds of the award. Iannone never received any money from Crispino and never received a bill for his services.

After the People rested, Crispino introduced evidence that in late 1995, Furino and her husband were referred to Crispino by Howard Webber, an attorney who had represented them when they were sued after "back[ing] out" of the purchase of a house. The Furinos lost the case at trial and owed $35,000 to $36,000. In February 1993, Crispino first met the Furinos at his office in the World Trade Center.

According to Crispino, the Furinos agreed to pay Crispino $175 an hour, and in the course of Crispino's representation, he incurred substantial costs for filing fees, travel costs, and the printing of the appellate record and brief. The Furinos gave Crispino $1,500 in two payments to cover the preliminary costs, and in September 1996, they gave him a $25,000 check marked "Partial Escrow for Tepper," in order to "cover costs."

Crispino testified that he did an extensive amount of work on the case, including a motion in the trial court, an appeal to the Appellate Division, Second Department, and a motion for reargument of the appeal,

all of which were unsuccessful. After the motion for reargument had been denied, at the Furinos' insistence, Crispino sought leave to appeal to the New York State Court of Appeals and then moved to reargue the denial of leave. However, after Crispino had prepared a "recapitulation" of previous bills which was mailed to Furino in December 1997, she became "quite upset" about the amount of the bill and began calling Crispino, frequently speaking to his office manager or other people in the office. Because Crispino was often in court, he asked his employees to speak to Furino and find out what she wanted. According to Crispino, the problem started when Furino received the recapitulation and she realized she would have to pay on the judgment.

As to Jurasin, Crispino testified that in the fall of 1996, Curran, a law school classmate, referred Jurasin to him. Crispino agreed to represent Jurasin, and he filed a personal injury action on her behalf against New York City in the United States District Court for the Southern District of New York. After about five months of work on the case, he convinced the City to raise its settlement offer from $10,000 to $50,000. Curran and Jurasin agreed to accept the offer. Jurasin then executed a release and signed other necessary documents to settle the case. Then, Crispino "just sat back and waited for the proceeds to come in."

In February 1997, Jurasin expressed "some dismay" to Crispino about the settlement amount and asked whether they could "undo" it so that she could get more money. Crispino explained that was not possible because the release had already been executed. Jurasin then suggested that Crispino's one-third fee might be "too much," since the case had settled within five months without requiring a great deal of work. However, Crispino explained

that the fee was not just for the work he had done on the case but also because he had "positioned [the case] properly" by bringing it in federal court and thus "basically backed the City into a settlement."

Despite this explanation, Jurasin was still "not satisfied" because she had talked to a friend or relative who thought that the settlement was inadequate. At that time, Crispino anticipated that he would need "additional cash" later in the year because he was moving to a larger suite of offices at the World Trade Center. He therefore suggested to Jurasin that if she would wait a year for her money, he would get her "ten percent more on the settlement" and would "forgive" $1,000 of the cost that would otherwise have reduced the settlement before attorney's fees were calculated.

After several further conversations, Jurasin agreed to Crispino's proposal because she did not immediately need the money and felt that the amount Crispino suggested was fair. Crispino then prepared an authorization agreement, which was sent to Jurasin to sign. The document memorialized Jurasin's agreement to loan the money to Crispino, and to allow him to sign documents and negotiate checks on her behalf. Jurasin signed the agreement and mailed it back to Crispino. About four months later, on the day Crispino received the settlement check from the City, he sent Jurasin a notice confirming that one year from that date she would be paid $33,478.14 plus interest, and that $1,000 in costs would be forgiven. The original was mailed to Jurasin, and Crispino later confirmed that she had received it.

Later Curran made inquiries about the case. Although Crispino believed that Curran owed Crispino money from their work together on several other cases, Curran believed that Crispino owed him a fee in the Jurasin matter, and Curran spoke to

Jurasin about it. Crispino did not "know what happened," but Jurasin told him that Curran was "pressuring" her, and the "next thing [Crispino] kn[e]w," complaints had been made about him.

As to Iannone, Crispino testified that he had known her husband casually since high school. In 1992, Iannone's husband called Crispino and told him that his wife had been terminated from her job and wanted to file a lawsuit. Crispino met with Iannone and agreed to represent her. Their oral fee agreement was that Crispino would receive "one-third of the recovery or whatever the court set in the case."

Crispino filed suit on Iannone's behalf in the United States District Court for the Southern District of New York. Approximately four years later, after extensive depositions and interrogatories, the case proceeded to trial, and Crispino secured a $317,000 verdict in Iannone's favor on a claim of retaliatory termination. However, the judge subsequently reduced the award to approximately $75,000 plus interest.

Iannone was unhappy with the reduction and decided to appeal, and Crispino filed a notice of appeal on her behalf. Crispino asked that she pay him an additional fee for representing her on the appeal. However, Iannone "took umbrage" at Crispino's request for an increased fee.

In February 1997, after researching the case which the trial judge had used as a basis for reducing the award, Crispino told Iannone that he did not want to perfect the appeal because he believed that an appeal would be fruitless. The appeal was then "at a standstill," until the Second Circuit Court of Appeals eventually dismissed the Notice of Appeal. At that point, Crispino contacted Beech to ask whether her client would pay the judgment. In late June or early July of 1997,

Beech sent Crispino a check, made out to Crispino as attorney for Carla Iannone. Crispino told Iannone that the judgment had been paid. Iannone was dissatisfied with the amount and was not pleased when Crispino told her that he believed that the entire award was taxable. Crispino also advised her that under their agreement, he was entitled to more than one-third of the award as a fee since he had researched the possibility of an appeal.

According to Crispino, Iannone insisted that she would accept the award only if Crispino paid her in cash. Although Crispino recognized that it was probably a "stupid thing" to do, he agreed to pay Iannone in cash since he had a "fair amount" of cash and since he had known her and her husband for a long time. In exchange for the cash payment, Iannone agreed to pay Crispino a fee larger than one-third of the award. Accordingly, on August 7, 1997, Crispino met Iannone at a diner in New Jersey and paid her her share of the judgment in cash. After the meeting, Iannone signed the satisfaction of judgment form and also a bill reflecting the increased attorney's fee. Crispino brought the signed bill to his office and mailed the original to Iannone, while keeping a copy for the files.

In February 1998, Iannone telephoned Crispino and was still upset about the reduction of the award and about having paid an increased attorney's fee. After February 1998, Crispino did not hear from her again until he was notified about the instant indictment, and he was not aware until then that she had filed a complaint.

On September 28, 2000 Crispino was convicted of one count of Grand Larceny in the Second Degree, two counts of Grand Larceny in the Third Degree, and two counts of Criminal Possession of a Forged

Instrument in the Second Degree.[3] On December 6, 2000, Crispino pled guilty to all counts under Indictment Numbers 4090/99 and 8223/99, on the understanding that he would be sentenced to an aggregate sentence of no more than seven to twenty-one years on all three cases. On January 9, 2001, Crispino was sentenced as noted above.

Crispino, proceeding *pro se*, filed a brief with the Appellate Division arguing that the trial proof as to certain counts was insufficient and that the verdict as to one count was against the weight of the evidence. Crispino also complained that the trial judge should have precluded the People's use of documents from the DDC and documents obtained through the allegedly improper use of grand jury subpoenas, and that the court erred in refusing to dismiss the indictment because of these alleged improprieties. Next, Crispino argued that the court made numerous evidentiary errors. Crispino also contended that the trial court made comments that improperly shifted the burden of proof and that the trial judge's instruction to the jury on larceny was erroneous. Crispino further complained that the prosecutor improperly cross-examined defense witnesses and made inappropriate remarks in her opening statement and during summation. With respect to the two indictments on which Crispino pled guilty, Crispino claimed that the People failed to establish geographical jurisdiction. Finally, as to all three indictments, Crispino complained that he was illegally sentenced to consecutive terms on certain counts and that his sentence was excessive.

The Appellate Division, First Department, unanimously affirmed Crispino's conviction. *See People v. Crispino*, 298 A.D.2d 220, 748 N.Y.S.2d 718 (1st Dep't 2002). The Appellate Division first determined that the jury's verdict was "based on legally sufficient evidence and was not against the weight of the evidence." *Id.* at 221, 748 N.Y.S.2d at 719. According to the Appellate Division, there was "no basis upon which to disturb the jury's determinations concerning credibility" and the "evidence clearly established all of the elements of the crimes charged." *Id.* The court also found that the record supported the motion judge's determination that the prosecution did not violate the confidentiality provisions of Section 90(10) of New York's Judiciary Law. *Id.* Moreover, by the time Crispino's criminal trial began, Crispino had been disbarred and the contested documents "had become public records." *Id.*

The Appellate Division also rejected Crispino's claim that the prosecution had abused the grand jury process by subpoenaing his bank records after the indictment had already been voted and as a result, the documents should have been precluded at trial. *Id.* The court held that Crispino had "no standing to challenge the bank's production of its own records, since [Crispino], as a customer, ha[d] no proprietary interest in the records." *Id.* In any event, the court concluded that "preclusion was not required since there was an ongoing grand jury investigation of the activities of [Crispino] and an accomplice when the subpoenas were issued." *Id.* at 221, 748 N.Y.S.2d at 719–20. In addition, the court also rejected Crispino's claims of an impairment of the grand jury process since such claims were "unsupported by the record." *Id.* at 221, 748 N.Y.S.2d at 720.

Regarding Crispino's evidentiary claims, the Appellate Division held that "a proper foundation was laid for the admission of various bank records and checks . . . and it was not necessary that the authenticating

---

3. The criminal possession of stolen property charges were not submitted to the jury.

witness be a custodian of the records." *Id.* (citations omitted). In addition, it was determined that the trial court "properly exercised its discretion in curtailing the exploration of collateral matters . . ., and did not unduly restrict the presentation of a defense." *Id.* (citations omitted).

With respect to the court's comments during Crispino's summation, the Appellate Division found that they were "appropriate to prevent the jury from being misled by [Crispino's] comments and improper instructions on the law . . ., and did not lessen the People's burden of proof." *Id.* at 221–22, 748 N.Y.S.2d at 720 (citations omitted). Moreover, the court rejected Crispino's claim that the court erred when he attempted to introduce his own affidavit into evidence "since the document constituted inadmissible hearsay." *Id.* at 222, 748 N.Y.S.2d at 720. The court found that Crispino's claims of lack of geographical jurisdiction under Indictments Numbers 4090/99 and 8223/99 were "waived by his guilty pleas." *Id.*

The Appellate Division also held that the sentencing court properly imposed consecutive sentences under Indictments 8550/98 and 8223/99. *Id.* However, the court vacated and dismissed Crispino's convictions for criminal possession of a forged instrument under the eighth, ninth, and tenth counts of Indictment 4090/99 pursuant to Section 170.35 of the New York Penal Law, and the Appellate Division took notice of the fact that the People had conceded that the sentences for the two grand larcenies charged in the eleventh and twelfth counts should run concurrently with the term imposed for criminal possession of stolen property as charged in the first count. *Id.* Finally, the court found "no basis for a reduction of sentence," and held that it had "considered and rejected [Crispino's] remaining claims." *Id.*

In letters dated January 31, 2003 and February 25, 2003, Crispino applied for leave to appeal to the New York State Court of Appeals, requesting review of all of his claims raised in the Appellate Division. The New York County District Attorney's Office did not oppose this request. On March 12, 2003, New York Court of Appeals Judge George Bundy Smith denied Crispino's application for leave to appeal. *See People v. Crispino,* 99 N.Y.2d 627, 760 N.Y.S.2d 108, 790 N.E.2d 282 (2003).

## Discussion

### A. The Habeas Corpus Standard

#### 1. Statutory Provisions

Crispino seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. As he has filed for habeas corpus relief after April 26, 1996, certain provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") are applicable here. *See* 28 U.S.C. § 2254(d); *Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). These provisions, codified at 28 U.S.C. § 2254(d), specify that:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

According to the U.S. Supreme Court, the provisions introduced by the 1996

amendment have imposed a "new constraint" on courts reviewing habeas corpus petitions regarding claims that were reached on the merits by the state court. *Williams,* 529 U.S. at 412, 120 S.Ct. 1495. In addressing 28 U.S.C. § 2254(d)(1), the Court explained that under the "contrary to" clause, a habeas court "may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts." *Williams,* 529 U.S. at 412–13, 120 S.Ct. 1495; *see also Harris v. Kuhlmann,* 346 F.3d 330, 344 (2d Cir.2003).

In addressing the "unreasonable application" cause, the Court stressed that "unreasonable" does not mean "incorrect" or "erroneous." *Williams,* 529 U.S. at 410–11, 120 S.Ct. 1495. A writ therefore may only issue "if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413, 120 S.Ct. 1495; *see also Vasquez v. Strack,* 228 F.3d 143, 147–48 (2d Cir.2000). The Second Circuit has interpreted the 1996 amendment as requiring the denial of a habeas corpus petition even in cases where the state court is incorrect, so long as the state court is not unreasonable. *See Jones v. Stinson,* 229 F.3d 112, 119–21 (2d Cir.2000). If the dispute involves a purely factual question, Section 2254(d)(2) governs, and a federal court can grant a habeas corpus application only if the state court's decision "'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Harpster v. Ohio,* 128 F.3d 322, 326 (6th Cir.1997) (quoting 28 U.S.C. § 2254(d)(2)); *see also Channer v. Brooks,* 320 F.3d 188, 195 (2d Cir.2003). A state court determination of a factual issue is "presumed to be correct" and the petitioner can rebut the presump-

tion only by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

In addition to imposing a more deferential standard of review, the 1996 amendment restricts courts when reviewing habeas claims to the case law of the U.S. Supreme Court. *See Williams,* 529 U.S. at 410–13, 120 S.Ct. 1495; *DelValle v. Armstrong,* 306 F.3d 1197, 1200 (2d Cir. 2002). Accordingly, and as appropriate, the courts evaluating a habeas petition should survey the legal landscape at the time the state court adjudicated the petitioner's claim to determine the applicable U.S. Supreme Court authority, as federal law is "clearly established" only if the Supreme Court precedent in existence at the time of the petitioner's conviction would have compelled a particular result in the case. *See Williams,* 529 U.S. at 412, 120 S.Ct. 1495 (The phrase "'clearly established Federal law' ... refers to the holdings, as opposed to the *dicta,* of this Court's decisions as of the time of the relevant state-court decision."); *accord Parsad v. Greiner,* 337 F.3d 175, 181 (2d Cir.), *cert. denied,* 540 U.S. 1091, 124 S.Ct. 962, 157 L.Ed.2d 798 (2003); *see generally* 28 U.S.C. § 2254(d).

### 2. *The Harmless Error Standard*

■ In *Brecht v. Abrahamson,* 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993), the Supreme Court articulated the standard of review a federal court should apply to habeas corpus petitions from state prisoners in determining whether a constitutional error was "harmless." *Id.* at 630–31, 113 S.Ct. 1710. The Supreme Court identified two categories of constitutional error. "Structural errors," which are "structural defects in the constitution of the trial mechanism, defy analysis by 'harmless-error' standards." *Id.* at 629, 113 S.Ct. 1710 (quoting *Arizona v. Fulminante,* 499 U.S. 279, 309, 111 S.Ct. 1246,

113 L.Ed.2d 302 (1991)). An example of such an error is the deprivation of the right to counsel; such a structural error "requires automatic reversal of the conviction because they infect the entire trial process." *Id.* at 629–30, 113 S.Ct. 1710. The other category of error is "trial error," which " 'occurs during the presentation of the case to the jury,' and is amenable to harmless-error analysis because it 'may ... be quantitatively assessed in the context of other evidence presented in order to determine [the effect it had on the trial].' " *Id.* at 629, 113 S.Ct. 1710 (quoting *Fulminante,* 499 U.S. at 307–08, 111 S.Ct. 1246).

In the case of "trial errors" before a federal habeas court, the *Brecht* Court held that the *Kotteakos* standard, rather than the *Chapman* harmless error standard,[4] is applicable. *Id.* at 637, 113 S.Ct. 1710, 123 L.Ed.2d 353. Under the *Kotteakos* standard, the test is whether the error "had substantial and injurious effect or influence in determining the jury's verdict." *Id.* at 637, 113 S.Ct. 1710 (quoting *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)). In *O'Neal v. McAninch,* 513 U.S. 432, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995), the Supreme Court clarified that "[w]hen a federal judge in a habeas proceeding is in grave doubt about whether a trial error of federal law had 'substantial and injurious effect or influence in determining the jury's verdict,' that error is not harmless. And, the petitioner must win." *Id.* at 994.

With respect to the criteria for determining whether error is harmless, the Second Circuit has stated that:

Following AEDPA, this court has yet to define the standard of review appropriate to determine whether a non-structural constitutional error challenged on collateral review is harmless where the state court does not address the question of harmlessness. *See Benn v. Greiner,* 402 F.3d 100, 105 (2d Cir.2005); *Gutierrez v. McGinnis,* 389 F.3d 300, 306–07 n. 7 (2d Cir.2004); [*Ryan v. Miller,* 303 F.3d 231, 253–54 (2d Cir.2002) ]. Prior to the passage of AEDPA, on collateral review, determination that an error was not harmless required a court to find that the error "had substantial and injurious effect or influence in determining the jury's verdict." [*Brecht v. Abrahamson,* 507 U.S. 619, 623, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (quoting *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)).] Alternatively, this court might apply AEDPA's standard of review for state court legal conclusions—whether the state court's resolution of legal questions "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law"—despite the fact that the state court did not reach a determination on the question of harmlessness. 28 U.S.C. § 2254(d)(1); *see Benn,* 402 F.3d at 105. Where the question has arisen, this court has declined to resolve it, finding instead that the harmlessness determination would be identical under either analysis. *Benn,* 402 F.3d at 105 (citing analogous cases).

*Howard v. Walker,* 406 F.3d 114, 123 (2d Cir.2005).

---

**4.** In *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), the Supreme Court held "that before a federal constitutional error can he held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Id.* at 24, 87 S.Ct. 824. Previously, the Supreme Court had applied the *Chapman* standard to federal habeas cases. *See Yates v. Evatt,* 500 U.S. 391, 111 S.Ct. 1884, 114 L.Ed.2d 432 (1991); *Rose v. Clark,* 478 U.S. 570, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986); *Milton v. Wainwright,* 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972).

■ In addressing the present petition and Crispino's other papers submitted in this matter, the Court is mindful that Crispino is proceeding *pro se* and that his submission should be held " 'to less stringent standards than formal pleadings drafted by lawyers....' " *Hughes v. Rowe,* 449 U.S. 5, 9, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980) *(per curiam )* (quoting *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972)); *see also Ferran v. Town of Nassau,* 11 F.3d. 21, 22 (2d Cir. 1993). Indeed, district courts should "read the pleadings of a *pro se* plaintiff liberally and interpret them 'to raise the strongest arguments that they suggest.' " *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir. 1999) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)). Nevertheless, *pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law." *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) (quotation marks omitted).

### B. *The Denial of the Motivational Defense Was Not Constitutionally Infirm*

■ Crispino argues that the trial judge precluded him from presenting a defense attacking the motives of the prosecutor and complainants. Crispino points out that the trial judge acted *sua sponte* in denying his defense even though he outlined it in his opening statement and the People failed to object. In addition, he argues that his Sixth Amendment right to confrontation was also violated.

When Crispino raised the same claim on direct appeal, the Appellate Division denied it, and held that the trial court "properly exercised its discretion in curtailing the exploration of collateral matters, and did not unduly restrict the presentation of a defense." *Crispino,* 298 A.D.2d at 221, 748 N.Y.S.2d at 720. Because the Appel-

late Division adjudicated Crispino's claim on the merits, Crispino can only obtain a writ of habeas corpus if the Appellate Division's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d); *Williams,* 529 U.S. at 412, 120 S.Ct. 1495.

Prior to the trial of Indictment Number 8550/98, by motion to dismiss the indictment dated April 30, 1999, Crispino alleged prosecutorial misconduct in its investigation, arrest, and prosecution. This motion was denied on May 26, 1999. Crispino also moved to suppress or preclude copies of documents relating to the theft from Iannone, which he alleged that the People had improperly obtained from DDC in violation of New York's Judiciary law. Crispino also moved for the preclusion or suppression of bank records obtained pursuant to grand jury subpoenas which he claimed had been improperly issued. After conducting two hearings on these issues, the court denied suppression.

It should be noted that Crispino had already raised his claims concerning selective prosecution in an April 30, 1999 motion alleging prosecutorial misconduct. This motion was denied on May 26, 1999. Crispino raised the issue again in a July 10, 2000 suppression motion. After two evidentiary hearings, the motion was denied.

In his opening statement at trial, Crispino averred that he would show the jury (1) that the prosecution was "badly motivated," (2) that the District Attorney's Office had "conflicts of interest," and (3) that the District Attorney's Office and the DDC "violated certain laws." Crispino also emphasized that "nobody contacted me to ask me what was going on when they were investigating this case." Shortly afterwards, the trial judge cautioned both par-

ties about making certain arguments that each had suggested in their respective opening statements. First, the judge warned the People not to "harp on" the theme of breach of trust or to appeal to the jury's emotions about the hardships that Crispino's alleged actions caused the victims, except to the extent that it was relevant to the credibility of the witnesses. The judge then cautioned Crispino, based on his opening, that "[t]he motivation of the District Attorney's Office['s] selective prosecution ... is not an issue," and stated that he would "not permit ... an issue to arise in th[e] case as to whether there was a selective prosecution, malicious prosecution, whether it was collaboration between various agencies." The trial judge stressed that "[t]he only issue in this case [was] the credibility of the witnesses in that regard."

When Crispino asked if he could "inquire about [the People's] investigation," the trial judge responded that the People's investigation was "not an issue in this case." Only the facts are relevant; how they got them, that's something else. "The trial judge also stated that '[w]hether they treated you differently than somebody else, whether they were more or less aggressive, we don't try those issues.'" Finally, the trial judge stated that "[whether] the People meet their burden of proof, that's the issue in this case. How they gathered the facts ... [is] just not relevant, not part of a criminal case."

The judge then offered to "hear" Crispino on this topic, but Crispino turned instead to another matter, arguing that the People should not be allowed to suggest that he was under some obligation to cooperate with their investigation. Thereafter, Crispino never sought to present a particular witness or ask particular questions regarding the prosecutor's motivation or investigation.

■ As an initial matter, it is well established that the mere fact that a state court made evidentiary errors, without more, does not provide a basis for habeas relief. *See Estelle v. McGuire,* 502 U.S. 62, 72, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991); *Dunnigan v. Keane,* 137 F.3d 117, 125 (2d Cir.1998) quoting *Dowling v. United States,* 493 U.S. 342, 352, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990). Rather, erroneous evidentiary rulings amount to constitutional error only if such rulings have the effect of depriving the defendant of a fundamentally fair trial. *See Jones,* 229 F.3d at 120 (citing *Chambers v. Mississippi,* 410 U.S. 284, 302–03, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973); *Rosario v. Kuhlman,* 839 F.2d 918, 924 (2d Cir.1988)). The Second Circuit has stated:

> Whether the exclusion of [proffered] testimony violated [a habeas petitioner's] right to present a defense depends upon whether "the omitted evidence [evaluated in the context of the entire record] creates a reasonable doubt that did not otherwise exist." *United States v. Agurs,* 427 U.S. 97, 112, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). Thus, where "the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt." *Id.* at 113, 96 S.Ct. 2392.

*Justice v. Hoke,* 90 F.3d 43, 47 (2d Cir. 1996).

Here, the omitted evidence would not have created a reasonable doubt that did not otherwise exist. Indeed, the proffered evidence was wholly irrelevant to the issue of whether Crispino had committed the charged crimes.

Crispino has argued that the Appellate Division's decision was an unreasonable application of the Supreme Court decision in *Delaware v. Van Arsdall,* 475 U.S. 673,

680, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). The *Van Arsdall* court held that:

> a criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby "to expose to the jury the facts from which jurors ... could appropriately draw inferences relating to the reliability of the witness."

*Id.* (quoting *Davis v. Alaska,* 415 U.S. 308, 318, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974)); *see also Henry v. Speckard,* 22 F.3d 1209, 1214 (2d Cir.1994) (stating that "though the Confrontation Clause does not deprive the trial judge of all discretion to set limits on the cross-examination of a prosecution witness for potential bias ..., the court 'must allow some cross-examination of a witness to show bias' ") (quoting *United States v. Abel,* 469 U.S. 45, 50, 105 S.Ct. 465, 83 L.Ed.2d 450 (1984)).

Although the trial judge did not permit Crispino to cross examine witnesses on the issue of selective prosecution, the judge did permit Crispino to explore the motivation and credibility of the witnesses testifying against him. Crispino did, in fact, cross-examine the victims, without judicial limitation, concerning compensation claims and lawsuits that they had filed against him in connection with their complaints against him. Crispino also vigorously argued to the jury, without limitation, that the witnesses were motivated by greed and dissatisfaction with the outcome of their civil cases.

Further, even assuming *arguendo* the court's preclusion of certain evidence was error, that error was harmless. The overwhelming evidence at trial demonstrated: (1) that Furino had provided a check for $25,000 to purchase a bond while her appeal was pending; (2) that Crispino deposited the check into an interest bearing account; (3) that when Furino's appeal was dismissed, Crispino did not tell her despite her request that the $25,000 be released to the bonding company; and (4) that Crispino never released the money nor returned it to Furino. The evidence also established that after Jurasin had agreed to settle her lawsuit for $50,000 and the city had sent a settlement check to Crispino, Crispino forged Jurasin's signature and deposited the check into his own account, never informing her that her case had been settled and never providing her with any of the settlement proceeds. Finally, instead of pursuing Iannone's appeal of the reduction of her jury award for wrongful termination, Crispino accepted the amended judgment and deposited a check from the employer intended for Iannone into his escrow account. Without Iannone's knowledge, Crispino forged Iannone's signature on a satisfaction of judgment form and returned it to Beech and consented to its filing with the court. Evidence that the prosecutor was biased or had selectively prosecuted Crispino would not have created a reasonable doubt in light of this evidence.

Crispino has failed to demonstrate that the Appellate Division's decision was contrary to or an unreasonable application of Supreme Court precedent in its ruling prohibiting Crispino from presenting irrelevant evidence concerning the prosecutor's motives, and he had failed to show that his ability to challenge the credibility of the prosecution witnesses was impaired.

### C. *The Court's Comments Did Not Unconstitutionally Shift The Burden Of Proof*

Crispino has asserted that in two instances the trial judge made comments that improperly shifted the burden of proof. According to Crispino, the first

instance occurred during his summation when the trial judge sustained the People's objection after Crispino argued that the prosecution had failed to rebut his claim that Iannone had signed an acknowledgment of payment form. According to Crispino, by preventing him from commenting on the People's failure to call Iannone in rebuttal, and instead telling the jury that the People had no obligation to do so, the court shifted the burden of proof to Crispino. In the second instance, Crispino has contended that the court improperly sustained the prosecutor's objection during summation and instructed the jury to disregard Crispino's comment that "any evidence I brought to your attention that may relate to an element of their proof, [the People] will have to disprove that to you, beyond a reasonable doubt."

The Appellate Division denied this claim, which Crispino had also raised on direct appeal, holding that the trial "court's comments during [Crispino's] summation were appropriate to prevent the jury from being misled by [Crispino's] comments and improper instructions on the law . . . and did not lessen the People's burden of proof." *People v. Crispino*, 298 A.D.2d at 221–22, 748 N.Y.S.2d at 720. Because the Appellate Division's decision was neither contrary to nor an unreasonable application of Supreme Court precedent, Crispino is not entitled to habeas relief on this basis. *See* 28 U.S.C. § 2254(d).

During his summation, Crispino urged the jury to:

[l]ook at the motivations, who benefits, what documents support the position and what's missing. What would you like to see that's not there, and what does that tell you about the claim?

. . . They have the burden of proof to prove their case, beyond a reasonable doubt. Please remember, I have no

burden at all in this trial, however, I have shown you certain things.

Indeed, any evidence I brought to your attention that may relate to an element of their proof, they will have to disprove that to you, beyond a reasonable doubt.

[PROSECUTOR]: Objection.

THE COURT: Sustained, sustained. Disregard that comment.

(T. 374–75). Crispino has argued that sustaining the prosecutor's objection and instructing the jurors to disregard his comment was "tantamount to a negation" of the People's burden to prove his guilt beyond a reasonable doubt and to disprove his defense.

 However, trial courts have "wide latitude in limiting the scope of closing arguments." *Herring v. New York*, 422 U.S. 853, 862, 95 S.Ct. 2550, 45 L.Ed.2d 593 (1975). Allegations that the court improperly limited a summation are subject to harmless error analysis. *Ayuso v. Artuz*, No. 99 Civ. 12015(AGS)(JCF), 2001 WL 246437, at *7 (S.D.N.Y. Mar. 7, 2001). Pursuant to the Second Circuit's holding in *Howard*, any error with respect to the limitation of summation is harmless would be harmless unless it " 'had substantial and injurious effect or influence in determining the jury's verdict' " *Howard*, 406 F.3d at 123 (quoting *Brecht*, 507 U.S. at 623, 113 S.Ct. 1710 (quoting *Kotteakos*, 328 U.S. at 776, 66 S.Ct. 1239)).

 In this instance, Crispino invaded the court's province by instructing the jury on the law. *See, e.g., U.S. v. Wables*, 731 F.2d 440, 449 (7th Cir.1984) (stating that "[i]t is beyond question that 'it [is] for the judge, not counsel, to explain the law to the jury.' ") (quoting *United States v. Kramer*, 711 F.2d 789, 794 (7th Cir.1983)).

The trial transcript demonstrates that the court accurately and thoroughly instructing the jurors on the burden of proof

at the beginning and at the end of the case. The court's explicit instructions—which the jurors are presumed to have understood and followed, *see Richardson v. Marsh,* 481 U.S. 200, 211, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987)—ensured that the People's burden of proof beyond a reasonable doubt was not shifted or otherwise reduced.

Crispino has failed to establish that the Appellate Division's decision with respect to the limitations imposed on his summation was either contrary to or an unreasonable application of Supreme Court precedent. Therefore, the limitations imposed on summation give rise to no basis for *habeas* relief.

### D. *The Rejection Of Hearsay Evidence Was Not Constitutionally Infirm*

Crispino has argued that the trial court impermissibly excluded a five-page affidavit that Crispino had filed with the federal district court in support of his application for attorney's fees in the Iannone case. According to Crispino, the document, which was attached to the "bill" that Crispino claimed to have presented to Iannone in the New Jersey diner, should have been admitted because it "provided the key back-up" in justifying his bill to Iannone.

Crispino raised the same claim on direct appeal. In affirming Crispino's conviction, the Appellate Division found that his "attempt to introduce his own affidavit into evidence was properly denied since the document constituted inadmissible hearsay." *People v. Crispino,* 298 A.D.2d at 222, 748 N.Y.S.2d at 720.

■ As stated above, state evidentiary rulings do not implicate the federal constitution unless such rulings have the effect of depriving the defendant of a fundamentally fair trial. *See Jones,* 229 F.3d at 120. As stated above, whether the exclusion of proffered evidence violated a habeas petitioner's constitutional right to present a defense depends on whether " 'the omitted evidence [evaluated in the context of the entire record] creates a reasonable doubt that did not otherwise exist.' " *Hoke,* 90 F.3d at 47 (quoting *Agurs,* 427 U.S. at 112, 96 S.Ct. 2392).

Here, the Appellate Division was correct in affirming the trial court's decision since the affidavit was inadmissible hearsay. At trial, the People objected to the admission into evidence of the affidavit portion of the exhibit, which detailed the work Crispino claimed to have done on Iannone's case and the fees he claimed to usually receive for such work. The trial court ruled that this portion of the exhibit was inadmissible because it constituted hearsay, but permitted Crispino to introduce into evidence the purported bill which was supposedly signed by Iannone in the diner.

The five-page attachment to the bill that the court rejected was a self-serving document Crispino had prepared himself a year previously. Pursuant to New York evidentiary law, the trial court correctly determined that the attachment, an out-of-court statement offered to prove the truth of the matter asserted therein, was inadmissible hearsay. *See* 57 *N.Y. Jur.2d Evidence & Witnesses* § 259, at 552–53 (2000) (collecting cases). This analysis is not changed by Crispino's assertion that the attachment should have been admitted because its trustworthiness could have been tested.

Crispino has also contended that the document should have been admitted not for its truth, but because it was probative of his state of mind. To be sure, New York's hearsay rule does not exclude out-of-court statements demonstrating the state of mind of the declarant when his or her state of mind is an issue in the case. *See id.* § 266, at 564–65. However, Crispi-

no's state of mind had no relevance here. Even if the document showed that Crispino genuinely believed that he deserved over $38,000 in attorney's fees in this case, that belief had absolutely no bearing on the only relevant issues, as framed by Crispino's testimony: whether Iannone agreed to pay Crispino an enhanced attorney's fee and whether Crispino paid her the amount he owed her from the jury award.

In addition, the bank records and the uncontested testimony of Beech established that Crispino had accepted the amended judgment in Iannone's appeal and deposited a check from Iannone's former employer into his escrow account. Iannone testified that without her knowledge Crispino forged her signature on a satisfaction of judgment form and returned it to Beech, and she rejected Crispino's assertion that Iannone had indeed signed the document as well as the acknowledgment of the bill. In view of this testimony, even if the exclusion of the affidavit was in error, the error was harmless.

In sum, Crispino has failed to establish that the Appellate Division's decision was contrary to or an unreasonable application of Supreme Court precedent.

### E. The Opportunity To Litigate The Fourth Amendment Claim Bars Its Assertion

Prior to trial, Crispino made several motions to preclude or suppress evidence that he contended the People had obtained unlawfully, including documents relating to complaints made against him which Crispino contends were privileged pursuant to New York Judiciary Law § 90(10). Crispino claims that the trial court "relied on ex parte matters outside the record" without holding a hearing. As a result, he claims he was denied a full and fair hearing as provided in *Stone v. Powell,* 428

U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976). In addition, Crispino argues that the Appellate Division created a new *nunc pro tunc* exception in its decision that vitiated both the independent source and inevitable discovery doctrines under Supreme Court law.

■ The law is well-settled that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, ... a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Stone,* 428 U.S. at 494–495, 96 S.Ct. 3037. The Second Circuit has stated:

> In *Powell,* the Supreme Court held that "where the State has provided an *opportunity* for full and fair litigation of a Fourth Amendment claim, the Constitution does not require that a state prisoner be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." [*Powell,* 428 U.S. at 481–82, 96 S.Ct. 3037] (emphasis added). In the wake of *Powell,* this Circuit has developed a litmus test to discern when a state prisoner has been denied an opportunity for full and fair litigation of his fourth amendment claims. *See Gates v. Henderson,* 568 F.2d 830 (2d Cir.1977) (en banc), *cert. denied,* 434 U.S. 1038, 98 S.Ct. 775, 54 L.Ed.2d 787 (1978). *Gates* noted that "all that the [Supreme] Court required was that the state [ ] provide [ ] the *opportunity* to the state prisoner for a full and fair litigation of the Fourth Amendment claim...." *Id.* at 839 (emphasis in original). We concluded that review of fourth amendment claims in habeas petitions would be undertaken in only one of two instances: (a) if the state has provided no correc-

tive procedures at all to redress the alleged fourth amendment violations; or (b) if the state has provided a corrective mechanism, but the defendant was precluded from using that mechanism because of an unconscionable breakdown in the underlying process. *Id.* at 840; *see McPhail v. Warden, Attica Correctional Facility,* 707 F.2d 67, 70 (2d Cir. 1983).

*Capellan v. Riley,* 975 F.2d 67, 70 (2d Cir.1992). It has long been acknowledged that New York provides adequate procedures for litigating Fourth Amendment claims. *See* under N.Y.Crim. P. Law § 710.10 *et seq.; Capellan,* 975 F.2d at 70 n. 1.

Here, Crispino was provided an appropriate forum to address his Fourth Amendment allegations. In a pretrial motion dated July 10, 2000, Crispino sought suppression or preclusion of documents which he believed had been obtained by the People from the DDC. At a hearing on August 7, 2000, at the motion judge's request, the prosecutor responded to Crispino's claim that there was "some kind of referral of nonpublic information" by the DDC. The prosecutor answered that the "complainants ... came of their own free will" and had provided the contested documents to the prosecutor. Moreover, when the motion judge asked whether anything was ever disclosed "beyond the public file," the prosecutor stated that no such disclosure had been made. The motion judge denied Crispino's suppression motion in a written decision dated September 21, 2000. Crispino renewed the claim, and the court addressed the matter at a hearing on September 22, 2000 after reviewing an additional affidavit. Crispino again claimed that items that were used in the grand jury proceedings were illegally obtained from the DDC. The prosecutor responded that the documents were never received directly from the DDC but were provided

by the victims themselves and from Beech, Crispino's opposing counsel on the Iannone matter. Crispino, in connection with another motion relating to subpoenas, requested that the Court review the grand jury minutes. The motion judge then provided Crispino an opportunity to respond to the prosecution's representations. The motion judge reviewed the grand jury minutes, and based on the minutes and the prosecutor's statement, he concluded that the documents had been submitted to the grand jury by Beech. The motion judge concluded that the confidentiality provisions did not bar individuals from sharing information supplied to the DDC since the documents were in the possession of Beech and otherwise accessible to the prosecution.

Crispino then raised the claim on direct appeal with the Appellate Division, which also denied the claim, ruling that "[t]he record support[ed] the motion court's determination that the prosecution did not violate the confidentiality provisions of Judiciary Law § 90(10) ... In any event, by the time of [Crispino's] criminal trial, he had already been disbarred ..., so that the documents at issue had become public records." *People v. Crispino,* 298 A.D.2d at 221, 748 N.Y.S.2d at 719 (citations omitted). Finally, Crispino presented the claim to the New York Court of Appeals which ultimately denied leave to appeal on March 12, 2003.

█ According to Crispino, the motion judge's reliance on the grand jury minutes did not provide him with a full and fair hearing under *Stone v. Powell,* and the appellate review was a sham. However, the motion judge conducted two hearings where he allowed both the prosecution and Crispino to address the issue of the contested documents which were allegedly received from the DDC. The fact that Crispi-

no disagrees with the court's decision does not mean that he was denied a fair and full opportunity to litigate his Fourth Amendment claims. Moreover, Crispino has not alleged that his lack of success on his Fourth Amendment claim was the result of some breakdown in the underlying process such that the state courts "failed to conduct a *reasoned method of inquiry into relevant questions of fact and law.*" *Capellan*, 975 F.2d at 71. The fact that the court reviewed the grand jury minutes "is not enough, in and of itself, to establish that [Petitioner's] claims were not fully and fairly considered." *Mack v. Cupp*, 564 F.2d 898, 902 (9th Cir.1977).

Contrary to Crispino's assertions, the Appellate Division considered the Fourth Amendment issue in depth and explicitly determined the propriety of the trial court's use of the DDC documents in factoring in its decision to deny Crispino's suppression motion. Because Crispino had a full and fair opportunity to litigate his Fourth Amendment claim in state court, he is not entitled to habeas review of this claim.[5]

### F. *The Determination That The Guilty Plea Waived The Geographical Requirement Was Not Constitutionally Infirm*

■ Crispino has argued that the indictments to which he pled guilty were invalid because the People did not estab-lish geographical jurisdiction in New York County, *see* N.Y.Crim. P. Law § 20.40, and because indictment by a New York County grand jury violated the "vicinage requirement" under the State and Federal constitutions. He has also claimed that the indictments were a nullity because the People knew that no venue for the charges existed in New York County.

> The Supreme Court has recognized that: a guilty plea represents a break in the chain of events which has preceded it in the criminal process. When a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea.

*Tollett v. Henderson*, 411 U.S. 258, 267, 93 S.Ct. 1602, 36 L.Ed.2d 235 (1973). Therefore, if Crispino entered a voluntary, knowing, and intelligent guilty plea, any and all non-jurisdictional defects raised in the indictment are waived. *See id.* at 263, 93 S.Ct. 1602. In addition, even if Crispino's claims were not waived, they would provide no basis for habeas relief. Crispino claims that the New York courts did not have jurisdiction pursuant to N.Y. Crim P. Law § 20.40. However, the Second Circuit has held that this type of argument "fails to raise an issue of federal law, which is an essential prerequisite to

---

5. By letter motion dated February 28, 2005, Crispino has sought to compel discovery of documents concerning alleged improper communication between the DDC and the State. It is well established that "[a] habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course." *Bracy v. Gramley*, 520 U.S. 899, 904, 117 S.Ct. 1793, 138 L.Ed.2d 97 (1997). Discovery is only permitted where the district court finds "good cause" to allow it. *See* Rule 6(a) of the Rules Governing Section 2254 Cases. Such good cause exists

" 'where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is ... entitled to relief.' " *Bracy*, 520 U.S. at 908–09, 117 S.Ct. 1793 (quoting *Harris v. Nelson*, 394 U.S. 286, 299, 89 S.Ct. 1082, 22 L.Ed.2d 281 (1969)). As described above, Crispino has made no such showing. The foregoing discussion demonstrates that Crispino had a full and fair opportunity to litigate his Fourth Amendment claim. Therefore, the February 28, 2005 motion for discovery is denied.

habeas relief." *United States ex rel. Roche v. Scully,* 739 F.2d 739, 741 (2d Cir.1984). The *Roche* court stated that:

[a]lthough New York has chosen to style § 20.40 of its Criminal Procedure Law in terms of "jurisdiction," the statute is in fact concerned with venue. A violation of [New York's] laws allocating that jurisdiction among its various counties does not create a federal constitutional issue. As we stated in *United States v. Mancusi,* 415 F.2d 205, 209 (2d Cir. 1969), "no federal court to our knowledge has ever granted a writ where a state court's asserted lack of jurisdiction resulted solely from the provisions of state law."

*Id.* at 741–42.

■■■ In any event, since the evidence established that Crispino's law offices were in Manhattan during most, if not all, of the period covered by the two indictments, there is every reason to believe that elements of each crime occurred in New York County. The conversion of funds through banking activity which occurred in New York County satisfied the Section 20.40 venue requirement. *See, e.g., People v. Kronberg,* 277 A.D.2d 182, 183, 716 N.Y.S.2d 653, 655 (1st Dep't 2000). Likewise, the formation of the larcenous intent, which presumably occurred in New York County, also satisfies Section 20.40. *See, e.g., People v. Selim,* 227 A.D.2d 917, 918, 644 N.Y.S.2d 448, 449 (4th Dep't 1996); *People v. Iwaszkiewicz,* 120 A.D.2d 746, 747, 502 N.Y.S.2d 527, 527 (2d Dep't 1986).

In sum, Crispino has failed to establish that the Appellate Division decision with respect to Section 20.40 was contrary to or an unreasonable application of Supreme Court law.

## G. *The Jury Charge Was Not Constitutionally Infirm*

Crispino has argued that the trial judge's charge to the jury did not conform with the facts and theories presented by the prosecution and that the charge on the definition of larceny was "erroneous, confusing and prejudicial" because the trial court "integrate[d] embezzlement language" into the ordinary larceny charge, and "introduce[d] words of 'entrustment' into the jury's consideration."

When Crispino raised the same claim on direct appeal, the Appellate Division rejected the claim without comment. *People v. Crispino,* 298 A.D.2d at 222, 748 N.Y.S.2d at 720. As discussed above, because the Appellate Division adjudicated Crispino's claim on the merits, Crispino can only obtain a writ of habeas corpus if the Appellate Division's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d); *Williams,* 529 U.S. at 412, 120 S.Ct. 1495.

■■■ A claim of error relating to a jury instruction is grounds for federal habeas relief only if the erroneous instruction " 'so infected the entire trial that the resulting conviction violates due process.' " *Jackson v. Edwards,* 404 F.3d 612, 624 (2d Cir.2005) (quoting *Cupp v. Naughten,* 414 U.S. 141, 147, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973)). In deciding whether a given jury instruction violates due process, the court on habeas review must evaluate the instruction in the context of the overall charge. *See Mullings v. Meachum,* 864 F.2d 13, 16 (2d Cir.1988) (citing *Cupp,* 414 U.S. at 146–7, 94 S.Ct. 396; *Francis v. Franklin,* 471 U.S. 307, 315, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985)).

As an initial matter, the trial judge never used the words "embezzlement" and "entrustment" in charging the jury. Nor did the trial judge ever instruct the jury

regarding larceny by embezzlement in any form. Instead, he instructed the jury that "a person steals property and commits larceny when, with the intent to deprive another of their property, that person wrongfully obtains such property from the owner." The court then defined the term "deprive":

> Now a person intends to deprive, to permanently deprive the owner of property or to appropriate their property when (1), he causes such property permanently to be withheld from that person, or (2), he disposes of such property in such a manner or under such circumstances as to render it unlikely that the owner will ever recover their property.

(T.419). The court further explained that:

> A person wrongfully takes property from an owner when the person does so without the owner's consent, and then exercises control over the property for a period of time, however temporary, in violation of the owner's rights.

(*Id.*)

The court correctly instructed the jury that the term "deprive" encompasses the permanent withholding of property from an owner and also disposing of property in a manner that renders it unlikely that the owner will ever recover his property. This definition provided the jury with an accurate statement of the law, adhering strictly to the definition of "deprive" contained in the penal law, which specifically states: "to 'deprive' another of property means . . . (a) to withhold it or cause it to be withheld from him permanently . . . or (b) to dispose of the property in such manner and under such circumstances as to render it unlikely that an owner will recover such property." N.Y. Penal Law § 155.00(3).

■ Crispino argues that the trial judge's modified instructions changed the theory of the People's case by introducing the concept of embezzlement. However, the penal law specifically provides that, except where it is an element of the crime charged that property was taken from the person or obtained by extortion, the People need not disclose "the particular theory of larceny" on which they are relying. N.Y. Penal Law § 155.45(1) *see also People v. Duffy,* 231 A.D.2d 586, 587, 647 N.Y.S.2d 275, 276 (2d Dep't 1996). Moreover, the People must prove a particular factual scenario only when it is specifically set forth in the indictment and where proving a different set of facts at trial would mean a substantial change in a "material element" of the crime charges. *LanFranco v. Murray,* 313 F.3d 112, 119 (2d Cir.2002) (applying New York law).

■ In this case, the "material element" was simply that the value of the property stolen during the relevant period exceed $50,000 in the case of the first count, and that it exceed $3,000, with respect to the other two counts of larceny. *See* N.Y. Penal Law §§ 155.40(a), 155.35. The precise meaning of stealing the money was not a required element. *See People v. Spann,* 56 N.Y.2d 469, 473, 452 N.Y.S.2d 869, 871, 438 N.E.2d 402, 404 (1982); *People v. Hodge,* 157 A.D.2d 598, 598, 550 N.Y.S.2d 346, 347 (1st Dep't 1990). Thus, even if the indictment had specified that Crispino stole money from his victims by a particular means, proving at trial that he stole their money by another means would not have substantially changed the theory under which he was charged. And, here, where the indictment did not set forth any particular factual theory of how Crispino carried out his thefts, there was certainly no such change. Even if Crispino was unaware of the People's theory of his theft of his clients' money up until the opening statement, he cannot claim that he was prejudiced by any subsequent alteration in the People's theory. *See LanFranco,* 313

F.3d at 120; *People v. Cannon,* 194 A.D.2d 496, 498, 599 N.Y.S.2d 809, 811 (1st Dep't 1993).

Crispino also has claimed that the purportedly erroneous larceny charge "spilled over" and "tainted" the possession of forged instrument charges. The possession of forged instrument charges, which were grounded in Crispino's possession of a check and a legal form bearing forged signatures, were entirely unaffected by the particular theory of larceny on which the People proceeded. *See People v. Doshi,* 93 N.Y.2d 499, 505, 693 N.Y.S.2d 87, 90, 715 N.E.2d 113, 116 (1999).

Even if the trial judge had erred in its jury instructions in the ways that Crispino has asserted, the instructions, viewed as a whole, were an accurate and detailed definition for grand larceny in the second and third degrees and jurors are presumed to have followed the court's instructions. Therefore, there was no violation of Crispino's rights. Given the strength of the People's case, there is no possibility that any infirmity that may have existed in the instruction so infected the entire trial as to result in a due process violation.

Because the adjudication by the state court did not result in a decision that was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States, Crispino is not entitled to habeas relief.

## H. *The Evidence Was Not Legally Insufficient*

Crispino, raising the same claim as in his direct appeal, has complained that he was wrongfully convicted for the two counts of criminal possession of a forged instrument under Indictment Number 8550/98. Crispino contends that the checks he was convicted of negotiating and

depositing were made to "c/o" and "as attorney."

On direct appeal, Crispino challenged the weight of the evidence that demonstrated his guilt. As noted above, in affirming Crispino's conviction, the Appellate Division found that:

> [t]he jury's verdict was based on legally sufficient evidence and was not against the weight of the evidence. There is no basis upon which to disturb the jury's determinations concerning credibility. The credible evidence clearly established all of the elements of the crimes charged.

*People v. Crispino,* 298 A.D.2d at 221, 748 N.Y.S.2d at 719. Because the Appellate Division adjudicated Crispino's claim on the merits, Crispino can only obtain a writ of habeas corpus if the Appellate Division's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d); *Taylor,* 529 U.S. at 412, 120 S.Ct. 1495.

The Second Circuit has stated that:

> [i]n a challenge under 28 U.S.C. § 2254 to the evidentiary sufficiency of a state criminal conviction, we review the evidence in the light most favorable to the State and the applicant is entitled to habeas corpus relief only if no rational trier of fact could find proof of guilt beyond a reasonable doubt based on the evidence adduced at trial. *See Jackson v. Virginia,* [443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)]; *Fama* [*v. Comm'r of Corr. Services,* 235 F.3d 804, 811 (2d Cir.2000)]. Petitioner bears a "very heavy burden" in convincing a federal habeas court to grant a petition on the grounds of insufficient evidence. *See Quirama v. Michele,* 983 F.2d 12, 14 (2d Cir.1993) (internal quotation marks omitted).

*Ponnapula v. Spitzer,* 297 F.3d 172, 179 (2d Cir., 2002). Furthermore, a factfinder's verdict "may be based entirely on circumstantial evidence." *United States v. Libera,* 989 F.2d 596, 601 (2d Cir.1993).

When considering the sufficiency of the evidence of a state conviction "[a] federal court must look to state law to determine the elements of the crime." *Ponnapula,* 297 F.3d at 179 (quoting *Quartararo v. Hanslmaier,* 186 F.3d 91, 97 (2d Cir. 1999)). In this case, Crispino was convicted of one count of second-degree grand larceny, for stealing a jury award worth over $50,000 from Carla Iannone, and of two counts of third-degree grand larceny, for stealing $32,478.14 of Jurasin's settlement money and the $25,000 Furino gave him to purchase an appeal bond. Crispino was also convicted of two counts of second-degree possession of a forged instrument for negotiating the settlement check with Jurasin's forged endorsement and for providing Beech with a satisfaction of judgment form bearing Iannone's forged signature.

Crispino has only challenged his conviction on the criminal possession of forged instrument charges in his habeas petition. While not contesting the veracity of the testimony relating to those charges, Crispino claims that the evidence was legally insufficient as to those two counts, asserting that he was authorized to negotiate the checks he received on behalf of Jurasin and Iannone by putting them in his IOLA account, and that therefore the falsified endorsements on the checks were not necessary to "complete the instruments."

Under New York law, Crispino was properly convicted of criminal possession of a forged instrument in the second degree if it was proven beyond a reasonable doubt "with knowledge that it is [was] forged and with intent to defraud, deceive or injure another, he utter[ed] or pos-

sess[ed] any forged instrument of a kind specified in Section 170.10." N.Y. Penal Law § 170.25. Such forged instruments would include a check that has been "falsely made, completed or altered." N.Y. Penal Law § 170.00(7); *see also People v. Edmonds,* 251 A.D.2d 197, 199, 674 N.Y.S.2d 361, 363 (1st Dep't 1998). It would also include or any "instrument which does or may evidence, create, transfer, terminate or otherwise affect a legal right, interest, obligation or status" N.Y. Penal Law § 170.10(1). A person "falsely completes" a written instrument when, by adding, inserting or changing matter, he transforms an incomplete written instrument into a complete one, without the authority of anyone entitled to grant it. N.Y. Penal Law § 170.00(5). A "complete written instrument" is one which purports to be a genuine written instrument fully drawn with respect to every essential feature thereof, and an endorsement is deemed both a complete written instrument in itself and a part of the main instrument in which it is contained. N.Y. Penal Law §. 170.00(2).

■ The first count related to Iannone's forged signature on the satisfaction of judgment form. Crispino has no basis to challenge the sufficiency of that conviction, since Iannone unequivocally testified that she had neither signed the document herself nor authorized anyone else to sign it on her behalf. The testimony of Beech, as well as the document itself, established that the satisfaction of judgment form ostensibly signed by Iannone was a document that affected a legal right, in that it was filed in court to establish that the judgment in Iannone's favor had been satisfied. *See* Penal Law § 170.10(1). Thus, the testimony adduced by the People established all of the elements of second-degree possession of a forged instrument

with respect to the satisfaction of judgment form.

■ Crispino has claimed that the endorsement of Jurasin's settlement check that was deposited in Crispino's IOLA account was unnecessary in order for Crispino to negotiate the check since the check was drawn to him. In fact, the check was made out to "Merri Jurasin, c/o Domenick Crispino." Since the check was made out to Jurasin, it required Jurasin's signature to be deposited. Indeed, Crispino himself must have thought that to be the case, or he would not have deposited the check with Jurasin's forged endorsement rather than merely with his endorsement. Thus, there is simply no factual basis for Crispino's current assertion that he could have negotiated the check without Jurasin's endorsement.

In sum, the Appellate Division's decision as to the sufficiency of the evidence was neither contrary to nor an unreasonable application of Supreme Court law.

### Conclusion

Based on the facts and conclusions set forth above, the petition for a writ of habeas corpus is denied, and no certificate of appealability will be issued.

It is so ordered.